## LEWIS WILLIAMS, et al. v. H. C. SPINKS.

Western Section.   March 2, 1928.

Petition by Certiorari denied by Supreme Court, May 2, 1928.

Maddox & Maddox, of Huntingdon, for appellant.
J. T. Peeler, of Huntingdon, for appellee.

OWEN, J.   The bill in the instant case was filed November 22, 1922 by Lewis Williams and Cassie Williams, colored people, and residents of Carroll county, Tennessee, against H. C. Spinks, a resi-

dent of the State of Kentucky, but who had been operating clay pits, which operation consists of removing clay from the lands where he had purchased same, in Henry and Carroll counties. Complainants' bill was sustained and they were granted the relief prayed for. They sought to set aside a certain lease executed by the complainants March 26, 1917. On that date the complainants leased to the defendant for a period of thirty years, with the right to renew said contract for another thirty years, a certain described clay, which the defendant was permitted to take and remove from said lands of the complainant situated in the 9th civil district of Carroll county, and containing about seventy-seven acres. The lease was acknowledged before a Notary Public and filed for record in the Register's Office of Carroll county on the 7th day of April, 1917. The lease provided for a consideration of $1 and also that $200 had been advanced on the "within mentioned royalties." Defendant was to pay complainants twelve cents for each ton of two thousand pounds for ball clay and six cents per ton for sagger or wad clay. The lease further provided that complainants were to accept the railroad weights on cars shipped and the defendant to make a payment for all clays shipped within four months from the date of shipment. The lease also provided that said royalties should amount to as much as $10 per annum for each and every year in which said mining may be done. It further provided that if the defendant or his successors or assigns should fail for a period of one year to pay said royalty then said agreement shall terminate. Complainants were to remain in possession of the lands and to cultivate the same, the cultivation not to interfere with the defendant's mining.

The complainants alleged that the lease was obtained by deceit and fraud and without consideration; that they did not receive any part of the $200 or get any benefit therefrom. The bill also alleged that the defendant had not worked the lease and he was doing nothing towards developing said lease or removing the clay.

The defendant filed an answer denying all allegations of fraud. He alleged that he bought numerous leases from various parties in Henry and Carroll counties; that he had leases prepared on a typewriter, leaving the consideration blank, and the amount that he was to pay as royalties, and also the description of the lands leased; that a colored man by the name of Grant Clark came to defendant at Henry, Tennessee, and informed defendant that complainant Williams was anxious to lease his mineral or clay rights; that one of defendant's competitors was about to close a trade with Williams, and it was alleged that defendant in company with Grant Clark went to complainant's home where the lease in question was prepared and the complainant and his wife had their son Inman Williams to sign

their names to said lease. The defendant also signed the contract or lease. Complainants' home was about four miles from McKenzie, Tennessee. Defendant alleges he gave a check on the date the lease was given, to complainant for $200, which was drawn on a bank at Newport, Kentucky, and was paid a few days after it was given. He further alleged that he paid full value for the lease and that he had been paying $10 per year to the complainant, remitting the same by check; that he discovered that the complainant had not filed his title papers for record; that complainant turned over to the defendant on the day the lease was executed his title papers that were unrecorded, and that defendant took the same to Huntingdon, Tennessee, and had them recorded, paying $3.50 register's fees. This amount the Chancellor ordered the complainant to return to the defendant on the final hearing, which was done.

It is also insisted in the answer that the complainants fully understood the contract that they executed; that it was not a harsh contract and the defendant was entitled to have the same executed. He pleaded estoppel on the part of the complainants; that they had waited more than five years from the time the contract was executed and recorded before instituting their suit. The original check for $200 was made an exhibit to the answer. It showed the endorsement of complainant Lewis Williams, and that it had been cashed March 26, 1917 at a bank in McKenzie, Tennessee.

During the pendency of this suit, but after the defendant's deposition was taken, the defendant died and the cause was revived against his widow and his children. A number of depositions were taken, and on the final hearing the Chancellor sustained complainant's bill, held the lease to be void and a fraud on complainants' rights. Defendant excepted, prayed and was granted an appeal to this court, which he has perfected and has assigned five errors. The fifth error raises the full defense, and it is only necessary to set out said fifth assignment, which is as follows: "The Chancellor was in error in sustaining the bill in this cause, in declaring said lease void and setting the same aside and taxing the defendant with the cost. There is no proof to support the decree of the Chancellor in this cause."

The point controlling this lawsuit is one of fact. The suit is based upon a question of fraud and deceit.

The complainants admit signing the lease contract and delivering it to Spinks their title papers to be recorded. They claim they never heard of the $200 until about two or three years after the execution of the lease. The defendant wrote the complainant, sending him a check for $17.50 on royalties. Prior to that time he had made two remittances of about one year apart, sending $5 and $10. The defendant testified that he made a mistake in sending a $5-check and when he discovered that only $5 had been sent he had a check made

out for $17.50. The complainant Williams kept these checks and did not cash them, and in the third remittance defendant called complainant's attention to the fact that $200 had been paid on the royalties. The complainant soon thereafter wrote the defendant, stating that he had never received any of the $200 the defendant had given to Grant Clark and complainant's son, Inman Williams, and he asked in his letter that the lease be canceled and the contract set aside because the defendant had not fulfilled his part of the contract.

Complainants acknowledged the lease before W. D. Boaz, a Justice of the Peace of Carroll county, and a Notary Public, and who resides in McKenzie, Tennessee. After the lease was signed the defendant went to McKenzie and secured the services of Boaz to go to complainants' home and take the acknowledgments. They went about dark. They procured a white man by the name of Hudson and who ran a taxi business in McKenzie to take Boaz and defendant to complainants' home. In the complainants' home at the time of the execution of the lease were the two complainants Williams and wife and their two sons, Inman Williams and Lonnie Williams; Grant Clark and the defendant and his witnesses say a colored woman or colored girl. The complainants testify there was no woman at the home of the complainants when the lease was executed or acknowledged except Cassie Williams. Grant Clark had died. Lonnie Williams' deposition was not taken, although he was living in Carroll county at the time of the taking of the proof in this cause.

Complainants testify that the lease was not read to them by the Justice of the Peace or Notary Public.

Inman Williams testified that defendant gave him the check for $200 to induce Inman to get his father and mother to sign the lease and that he (Inman) cashed the check for $200; that he did not give the complainants any part of it; that he left in a very short time after getting the check cashed and was gone for more than a year; that, like the prodigal of old, he had a good time for awhile on this $200 and returned to the home of his father after his substance had been spent in riotous living, and otherwise, and that then he made known to his father that he had been off spending the proceeds of the $200-check. Inman says that his father and mother never saw the $200-check. The complainants and Inman also testified that the defendant said he wanted the lease for four or five years and nothing was said about thirty years. Inman testified that he signed his father's name on the back of the check, and drew the $200; that he signed his father's name to the lease; that his father approved of the signing of said lease. It appears that Inman signed his father's name quite often and his father approved of this. The complainant Lewis Williams cannot read or write. The complainants both testify that Inman left their home on the 27th day of March, 1917; that he came

back in May, 1919. Inman says that he came back in July, 1918; that he went to war. We are of opinion that he did come back in 1918. Complainants say that Inman never told them anything about the $200 and that they never knew of the $200-check until they received defendant's letter in April, 1920, while Inman says he told his father and mother about the $200-check when he returned from his trip in which he visited a number of cities and spent the $200.

Three witnesses testify that complainants are people of good character and entitled to full faith and credit on their oaths. These same witnesses also testify that W. D. Boaz, the Notary Public, is a man of good character. Boaz and Hudson both testify that the defendant called Williams' attention to the $200 check the night that they were out there; that Boaz read over the lease to the complainants before he took their acknowledgments and that they freely acknowledged the same; that Inman was not in the house at that time or using any influence to get his father and mother to sign said lease; that Spinks told Lewis Williams not to let his son get hold of the $200-check; that the $200-check was presented and delivered to the complainant Lewis Williams by Spinks at the time the acknowledgment was taken. This is testified to by Spinks, Boaz and Hudson. Spinks denies he ever delivered any check to Inman Williams and states that he did not get Inman Williams to use his influence with his father to make the lease;—in fact he never discussed the lease with Inman and nothing was said about the lease being for four or five years.

It appears that the price agreed to be paid for this clay was as much or more than was being paid by the defendant and his competitors in a like business for other clay in the vicinity where Williams lived. It further appears that this is not the first time that Williams had made a lease of his lands for clay to be mined or removed. He had other lands beside the seventy-seven acres in controversy. The defendant testified that he had not done any mining on the seventy-seven acres for the reason that he had not had time or had not been able to get to it because of other operations; that the purpose of the $200-check was to cover such a contingency or delay in mining the clay. The complainants insist that defendant did not pay the $1 consideration which the lease recites beside the $200-check. It appears that the complainants prepared dinner for the defendant and Grant Clark on the day the lease was executed. Complainants state that defendant paid them fifty cents for his dinner.

We are of opinion that $1 was paid by the defendant. The complainants probably thought that was paying for defendant's dinner and that of Grant Clark, while defendant was under the impression it was paid as part consideration for the execution of the lease. The point is also pressed by complainant that the $200-check was cashed on the 26th day of March at McKenzie, Tennessee. The check shows

a stamp of March 26, 1917 by a bank at McKenzie which has since said date ceased to do business. We do not think this overcomes the positive proof of Spinks, Boaz and Hudson, who saw the check at the home of complainants on the night or evening of March 26th. Inman Williams testified that he did not cash it until March 27th and he left immediately for Paducah, Kentucky. He probably had the check cashed early in the morning of March 27th and the date of March 26th had not been changed to March 27th at the time the bank put its stamp on the back of said check.

We are of opinion that complainants have failed to establish fraud, or deceit or misrepresentation in regard to the signing and acknowledgment of the lease to the defendant. Complainants are both old people. Lewis Williams was born a slave. Their minds are frail and imperfect. They tried to tell what happened more than seven years before the taking of their depositions. A careful consideration and weighing of their evidence establishes the fact that their recollections are quite hazy and clouded. The Justice of the Peace and Notary Public, whose reputation is proved to be good by the same witnesses who testify as to the character of complainants, has no interest in the outcome of this lawsuit. The complainants and their son are interested. The defendant Spinks was interested. The burden was upon complainants to establish their charge of fraud and deceit by a preponderance of the evidence. In our opinion they have failed to do this. Complainants are undertaking by parol evidence to set aside and hold for naught a written obligation that was duly signed, acknowledged and recorded more than five years prior to the filing of their bill. The complainant Lewis Williams knew that this lease was going to be recorded because at the time he acknowledged it he gave to the defendant his title papers which were likewise to be recorded.

A contract obtained by fraud is not void but simply voidable. So on discovering the fraud by which he was induced to enter into the contract the party defrauded may elect whether he will treat the contract as binding or refuse to be bound by it, but until he so elects it continues valid and a contract obtained by fraud, being voidable and not void, may be ratified by the parties who were induced by the fraud to enter into the contract, but a party may lose his right to rescind a contract by not availing himself of his right within a reasonable time after discovering the fraud, or after he might have discovered it by due diligence. So in equity unreasonable delay in taking steps to set aside a fraudulent contract will have the effect of affirming it. Cyc., Vol. 9, pp. 431 and 435.

Fraud is never presumed, it must be clearly proved, the burden of proof is on the complainant and the law is, "in all cases, except those involving transactions between persons occupying fiduciary or confidential relations with each other where the right to relief is based

494

upon the alleged commission of the fraud, the presumption is in favor of the fairness of the transaction and the innocence of the person accused, and the burden of proof is upon the party asserting the fraud to establish the same." Ency. of Ev., Vol. 6, p. 6.

The party alleging fraud takes upon himself the burden of proving every necessary and material element of fraud and fraud will not be presumed from a showing merely that a motive or intent to perpetrate the same existed.

Fraud is always required to be set up promptly when discovered, or it may be treated as waived. Clement v. Ins. Co., 101 Tenn., p. 22, 46 S. W., 561.

On the sufficiency of evidence to establish fraud, it has been stated that the evidence must be clear and satisfactory. Some authorities hold that it must be clear, cogent and convincing or strong and decisive. The general rule is that the evidence to be sufficient to establish fraud should prove a state of facts which is not fairly or reasonably reconcilable with fair dealing and honesty of purpose, and which would lead a reasonable man to the conclusion that fraud in fact existed. R. C. L., Vol. 12, Sec. 183.

It results that the fifth assignment of error is sustained. The judgment of the lower court is reversed and complainant's bill is dismissed. The complainants will pay the cost of the cause, including cost of the appeal, for which execution will issue.

Heiskell and Senter, JJ., concur.