IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 5, 1999 Session

# MARY JARMAKOWICZ, ET AL. v. BILLY SUDDARTH, ET AL.

**Appeal from the Circuit Court for Sumner County**
**No. 17316-C    Thomas Goodall, Judge**

_____

**No. M1998-00920-COA-R3-CV - Filed February 28, 2001**

_____

This appeal arises out of a dispute over the purchase of Nationwide Travel Services, LLC. The jury found that the Sellers were still the owners of the agency and found for Buyers on the Sellers' claim for breach of contract. The jury found for Buyers on their claims of fraud and deceit, conversion and abuse of process and awarded compensatory damages. At the close of the proof, the trial court granted Sellers' motion for directed verdict on the issue of punitive damages. Later, the court denied Buyers' Motion for discretionary costs, and this appeal resulted. Buyers take issue with whether the trial court properly granted a directed verdict on punitive damages and whether the Court abused its discretion by denying discretionary costs. Sellers argue there was not sufficient evidence to support the jury's award on fraud and deceit, conversion and abuse of process. They also argue that the jury should have found for Sellers on the breach of contract claim. For the reasons below, we affirm the jury's award of compensatory damages and hold there was sufficient evidence to support the jury's determination of fraud and deceit, conversion, abuse of process and no breach of contract. Further, we affirm the trial Court's directed verdict on the issue of punitive damages. However, we vacate the denial of Buyers' motion for discretionary costs and remand for consideration consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part, Vacated in Part, and Remanded.**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, and BEN H. CANTRELL, P.J., M.S., joined. WILLIAM C. KOCH, JR., J., not participating.

William E. Long, Jr., C. Eric Stevens, and Taylor B. Mayes, Nashville, Tennessee, for the appellants, Mary Jarmakowicz and Mark Heeney.

Philip Kelly and Gwynn Smith, Gallatin, Tennessee, for the appellees, Billy Suddarth, Angela Suddarth and Nationwide Travel Services, LLC.

**OPINION**

Angela and Billy Suddarth ("Sellers") owned and operated Nationwide Travel Services, LLC ("Nationwide Travel"), a travel agency located in Hendersonville, Tennessee. Mary Jarmakowicz and Mark Heeney ("Buyers") entered into negotiations to purchase the travel agency which culminated in the underlying action.

Sellers purchased Cox Travel in June 1996 and renamed it Nationwide Travel Services, LLC. They paid nothing for the assets of Cox Travel, but invested $10,000 to get the business going. Mr. Suddarth testified he considered this a "minimal investment" compared to some of his other businesses.

In September 1996, Mrs. Suddarth informed Ms. Jarmakowicz, her sister, that the travel agency was losing money and asked for her help. In response, Ms. Jarmakowicz moved from her Florida home to Hendersonville to work at the agency. Salary was not discussed. Ms. Jarmakowicz moved in with the Suddarths, began working at the travel agency and caring for the Suddarths' children when they were away. Mrs. Suddarth handled the financial portion of the travel business from her husband's office, while Ms. Jarmakowicz and two other employees worked at the agency, located nearby.

During a telephone conversation in November, Ms. Suddarth purportedly stated she was so proud of her sister that she intended to give Ms. Jarmakowicz the travel agency for Christmas. Mrs. Suddarth gave her the agency's checkbook and said, "Here you go, it's yours." However, Ms. Jarmakowicz only wrote checks Mrs. Suddarth told her to pay. On December 18, Mrs. Suddarth demanded the return of the travel agency checkbook, stating Ms. Jarmakowicz was not responsible enough to run the agency. However, while the two sisters spent the holidays in Florida, Mrs. Suddarth returned the checkbook to Ms. Jarmakowicz and instructed her to return to Hendersonville to assist their attorney in investigating whether a recently-discharged employee of the travel agency had taken money. The checkbook was returned to Mrs. Suddarth after the holidays. During January 1997, Ms. Jarmakowicz moved out of the Suddarths' home and at that point began receiving a salary from Nationwide Travel.

In March 1997, Mrs. Suddarth informed Ms. Jarmakowicz she could purchase the agency for $10,000, even though the Suddarths knew Ms. Jarmakowicz did not have the money at hand. In the discussions, it was agreed that for $10,000 Ms. Jarmakowicz "was to keep the name, the LLC was supposed to be transferred with the name and all the assets of the business. That included all the equipment that was inside, the name, the desks, the chairs, the roll-a-desks [sic] filing cabinets, things like that . . . [as well as] the operating account and the draft account." Mrs. Suddarth promised the bills would be current.

2

Ms. Jarmakowicz discussed the sale with her boyfriend, Mark Heeney, who lived in Michigan. She also tried to qualify for a small business loan, but was unsuccessful. Several drafts of a sales agreement were written as part of her attempt to obtain the small business loan.

In April 1997, Mr. Heeney obtained a $15,000 loan and traveled to Tennessee to discuss the purchase with the Suddarths. However, the meeting never occurred because the Suddarths attended a rock concert instead. After Buyers requested a written agreement, Sellers told Ms. Jarmakowicz to contact their attorney, who would represent all the parties. When Ms. Jarmakowicz called him, he dismissed her concerns about his ability to represent all parties to the transaction. He subsequently faxed a draft of the agreement to Sellers only.

Ms. Jarmakowicz testified Mrs. Suddarth first showed her the draft agreement in mid-April. When Ms. Jarmakowicz expressed dissatisfaction with some of the terms, she was told to contact the attorney. He made certain changes and agreed she could add a list of assets which would be included in the purchase as an exhibit to the agreement.

During this time period, Ms. Jarmakowicz attempted to prepare an application for change of ownership with the Airline Reporting Corporation ("ARC"), an entity which regulates certain on-line purchases of airline tickets by travel agencies. The ARC required travel agencies to maintain an ARC draft account with a certain minimum balance out of which tickets could be purchased. The ARC required a bond before ownership of an agency could be transferred. Without ARC approval of the transfer of the agency, the agency would not be authorized to issue tickets as it had previously.

In mid-April, Ms. Jarmakowicz opened a business account in the name of Nationwide Travel Services, LLC with $765 in personal money and some money from the travel agency. Mr. Heeney transferred $15,000 into that account. On April 24, 1997, even though no purchase agreement had been executed and the ARC application had not been approved, Ms. Jarmakowicz wrote two checks totaling $10,000 to purchase the agency. On May 2, Ms. Jarmakowicz paid the premium on the ARC bond.

On the day she paid Sellers, but before she paid them, Ms. Jarmakowicz called the bank and learned the operating account Sellers had used contained $954. She testified she intended to use those funds to pay bills. However, Mrs. Suddarth subsequently withdrew those funds. When Ms. Jarmakowicz challenged this action, Mrs. Suddarth came to the agency and placed $25 on Ms. Jarmakowicz's desk, asserting the amount was the correct balance because some agency checks had not cleared when Ms. Jarmakowicz obtained the balance earlier. However, the record shows Mrs. Suddarth had the remaining funds deposited in her personal account minus the $25 she paid to Ms. Jarmakowicz. At trial, Mrs. Suddarth admitted she was wrong in her belief the funds were hers.

On or about May 7, Mrs. Suddarth appeared at the travel agency with a box containing over $7,000 in unpaid taxes and bills, some of which were overdue. She gave the box to her sister, who had known nothing of any past due bills when she paid Sellers. Buyers expended personal funds to pay some of the overdue bills.

3

According to the record, May was an extremely busy month for the travel agency. Because of the number of tickets purchased, one of the agency's accounts ran approximately $1,000 short at the end of May. Ms. Jarmakowicz received a call from her banker informing her of that fact and she made a deposit later that day.

A few days later, Ms. Jarmakowicz's father called her from Florida and then put Mrs. Suddarth on the line, who purportedly began screaming that she was going to be put in jail because Ms. Jarmakowicz had bounced a check. During this conversation, Mrs. Suddarth offered to return the $10,000. Ms. Jarmakowicz declined because she had already invested more than that amount in the purchase price and payment of outstanding bills and she did not believe her sister's offer was sincere.

On May 28, Ms. Jarmakowicz received a package of sales documentation materials from the attorney. Ms. Jarmakowicz testified the sales documents were unsatisfactory because they did not convey the entire business and did not address the overdue bills. Although the cover letter was dated May 19, 1997, the agreement set a closing date of April 30, 1997.[1] However, the document contained no clause stating time was of the essence or the agreement would be cancelled if not consummated by a certain date. After reviewing the material, Ms. Jarmakowicz informed the attorney that Mr. Heeney would be coming to town the next weekend to discuss the documents with Sellers. On May 28, Mr. Heeney quit his job in Michigan to move to Tennessee and participate in the business.

On June 2, 1997, Ms. Jarmakowicz received a fax from Mr. Lowell which stated:[2]

It has come to our attention that you have been making untrue and disparaging remarks to third parties, including banking personnel, which could easily damage the business reputation of Billy Suddarth, Angela Suddarth and their several Nationwide companies.

This letter will demand that no such remarks be made and advise that such action if it results in damage to business reputation is actionable as slander and actionable as liabel [sic] if in writing. All such activity must cease immediately.

If this transaction is to be consummated, all terms must be agreed upon and all documents signed today.

In the meantime, all airline required paperwork, including IATAN and ARC and the letter of credit and/or bond must be obtained. Verification must be given that the

---

[1]Ms. Jarmakowicz did not receive the documents until May 28 because the wrong ZIP code was placed on the envelope.

[2]This letter was actually dated May 30, 1997.

4

ARC draft account is being maintained current by providing deposit slips to the ARC account and a copy of the weekly ARC report, until the ARC numbers are changed over to the purchaser.

Ms. Jarmakowicz testified Sellers knew Mr. Heeney had not yet arrived in town and therefore could not execute any documents on that day. After receiving this fax, Ms. Jarmakowicz repeatedly attempted to contact the attorney who sent it, but he did not return her calls. Ms. Jarmakowicz received a second communication from the attorney on June 3. It stated:

The above transaction was to have been completed by May 1, 1997. On April 21, 1997, the original agreement was presented for review. On May 16 you requested another copy of the original. On May 19, you were provided with a complete set of documents in connection with the purchase. You have not signed the Purchase Agreement or any of the accompanying documents. Neither has your proposed partner, Mr. Heeney.

At this point, the Sellers are no longer willing to enter into a agreement [sic] for purchase and sale of the travel business.

You are directed to discontinue all operations, activities and business as Nationwide Travel, LLC. The Sellers are no longer willing to sell and Sellers will conduct any and all continued operations of the business.

This letter will further demand a [sic] accounting of all monies and accounts received and expended during your managerial oversights to date. Any and all monies that have been exchanged to date will be placed in escrow pending potential claims.

After receiving this letter, Ms. Jarmakowicz immediately discontinued operations and sought legal representation. When she returned to the agency from counsel's office, Mr. Suddarth walked into the agency office and presented one of the employees with a temporary restraining order ("TRO") prohibiting Ms. Jarmakowicz from conducting business as Nationwide Travel until a hearing scheduled for June 17. As Mr. Suddarth presented the TRO, a locksmith began changing the locks.

The record shows on June 3, Sellers completed an affidavit during the process of seeking the TRO. The affidavit alleged in pertinent part: (1) Sellers as "owners of Nationwide Travel LLC," employed Ms. Jarmakowicz in a managerial capacity to operate the travel agency; (2) the parties entered into negotiations for Ms. Jarmakowicz to buy the agency; (3) although documents were drafted and monies exchanged, the terms were never agreed upon; (4) Sellers are no longer willing to sell the agency; (5) demands to cease operation and provide an accounting were made; (6) Ms. Jarmakowicz "has refused;" (7) "there have already been made disparaging remarks by Defendant to Plaintiffs' bank personnel;" and (8) failure to "restrain Defendant will result in immediate and irreparable harm to Plaintiffs."

Although Buyers' counsel suggested the parties meet and discuss the matter, the TRO was not lifted and the agency remained closed. On June 4, the Sellers' attorney wrote in pertinent part to Buyers' counsel:

> My clients will agree to lift the TRO for the purposes of picking up, running and delivering tickets already paid for by the customers and turning on the answering machine as well as handling the computer belonging to another individual.

On June 5, police reports were filed by several Nationwide Travel customers who feared their money or tickets had been stolen. That afternoon Ms. Jarmakowicz appeared in court and demanded the TRO be lifted. After a hearing that day, the TRO was dissolved and the Suddarths dismissed their complaint.

Ms. Jarmakowicz reopened the agency on June 6. On June 8 or 9, Ms. Jarmakowicz received a bill of sale executed by Sellers, with an attached list of furniture, fixtures, equipment and miscellaneous items. Her counsel responded with the following:

> The transaction your clients are now trying to consummate is not that agreed upon. My clients paid $10,000 in exchange for the shares of Nationwide Travel LLC, not simply the entity's assets.

> The bill of sale is not consistent with the most recent documents prepared by [the former attorney] for this transaction. Neither is the Bill of Sale consistent with the position taken by your clients when they obtained the temporary restraining order against Ms. Jarmakowicz. In fact, the list of assets, which was a part of the agreement for the purchase of the LLC, is not even accurate. My clients previously provided your clients with an accurate list of the assets of the company.

Between June 6 and July 23, Buyers attempted to keep the business going, while negotiations continued. However, business was not good, and certain past due bills remained in dispute. On July 24, Mr. Heeney decided they could no longer operate the agency. The next day their counsel informed Sellers' counsel:

> As a result of the false representations made by the Suddarths to Ms. Jarmakowicz and Mr. Heeney concerning the payment status of the Agency's debts, and the result of the insurmountable damage with the Temporary Restraining Order caused to the Agency's business, Ms. Jarmakowicz and Mr. Heeney are unwilling to purchase the Agency.

Buyers demanded return of their $10,000 and compensatory damages of $6,406 for expenditures for insurance and the bond; $5,000 in operating costs; $4,948 in lost wages for Mr. Heeney; $1,100 in unpaid wages for Ms. Jarmakowicz; $2,700 reimbursement for the ARC deposit; $800 in moving expenses; and unspecified damages for damage to reputation and emotional distress

from the TRO and concomitant police reports. They informed Sellers the agency would cease operations on July 31. In a subsequent letter, Buyers informed Sellers that in examining the check register they discovered that Ms. Jarmakowicz had started the operating account with $1,765 of her own money, which raised their demand to $31,756. Sellers responded by advising Buyers what to do with the keys and asking for a summary of the outstanding business and reservations. Buyers complied.

A week later, Sellers unilaterally informed Buyers the sale had been completed and Buyers were the owners. Sellers returned the keys and other items delivered to them. In order to mitigate damage to the agency and to innocent customers, Ms. Jarmakowicz agreed to respond to customer inquiries and wrap things up, but specifically informed Sellers she was waiving nothing in doing so.

On August 25, 1997, Buyers commenced the underlying action alleging, in pertinent part, fraud and deceit, conversion, and abuse of process. The complaint sought $50,000 in compensatory damages and punitive damages in the amount of $100,000. Sellers counterclaimed for breach of contract. The case proceeded to trial. At the close of the evidence, the court granted Sellers' motion for directed verdict on the claim for punitive damages. The jury awarded Buyers $25,365 as compensatory damages, found Sellers were the agency's owners and rejected Sellers' breach of contract claim. The trial court subsequently denied Buyers' motion for discretionary costs. This appeal ensued.

I.

Sellers argue no material evidence supported the jury's verdicts on the fraud and deceit, conversion and abuse of process claims Buyers asserted against them. They also claim that the jury's dismissal of their claim for breach of contract is not supported by the evidence. The differing claims made by the Sellers and the Buyers at trial and on appeal reflect a difference in how each side views the transactions. The Sellers contended at trial, and still contend, that there was a valid contract to sell the agency and claimed Buyers had breached that contract, despite their earlier affidavits that they were the owners of the business. Buyers contended at trial, consistent with their last letter to Sellers, that negotiations toward the sale had never been completed, and that Sellers had not transferred the business in accordance with their earlier oral representations. The jury found for the Buyers on the breach of contract claim, and that claim was dismissed. In response to a specific interrogatory, the jury found the Sellers to be the owners of the agency.

Those verdicts by the jury reflect a view of the transaction different from Sellers' view and consistent with the verdicts for Buyers on fraud and deceit, conversion, and abuse of process. Essentially, the jury has determined the facts in favor of Buyers' version. Under our standard of review, if there is material evidence in the record to support the jury's view, the verdicts must be affirmed.

Rule 13(d) of the Tennessee Rules of Appellate Procedure provides the standard of review applicable here:

Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. **Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict.** (emphasis added).

The parameters of our review are well settled.

It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to disregard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

II.

With these rules in mind, we first turn to the Sellers' argument that the evidence was insufficient to support the verdict for Buyers on the counterclaim alleging breach of contract. Sellers maintain there was a contract under two theories: (1) there was a binding oral contract which Buyers assented to by taking control of the business and/or (2) there was an implied contract because Buyers held themselves out as the owners of the agency.

A contract may be expressed or implied, written or oral, but, to be enforceable, it must, among other elements, result from a mutual assent to its terms, be predicated upon sufficient consideration, and be sufficiently definite for its terms to be enforced. *Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 34-35, 356 S.W.2d 277, 281 (1962); *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990).

It is possible that parties can make an oral agreement to bind themselves to prepare and execute a final written contract, but the oral agreement must include all essential terms to be incorporated in the final document. *Engenius Entertainment, Inc. v. Herenton*, 971 S.W.2d 12, 17 (Tenn. Ct. App. 1997). Additionally,

8

[t]hat document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain *any material term* that is not already agreed on, no contract has yet been made; the so-called "contract to make a contract" is not a contract at all.

*Id.* at 17-18 (citations omitted).

It is also well established that the oral contract must have the mutual assent of the parties and

[t]he contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer."

*Jamestowne on Signal, Inc.*, 807 S.W.2d at 564 (citations omitted).

Therefore, where the parties continue to negotiate regarding the material terms of a contract, there has been no mutual assent. *Peoples Bank v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991).

Here, the jury determined that Sellers were the owners of the agency, from which we can infer that the jury determined that there was no contract. This finding is supported by the evidence demonstrating there was no mutual assent as to the terms of the agreement. A written agreement between the parties, while contemplated, was never agreed upon nor executed. The record contains evidence supporting the jury's verdict that there was no oral contract to which the parties mutually assented to the necessary essential terms. The evidence also supports the jury's verdict that the Sellers were the owners of the agency. In addition to the disputes and disagreements of the terms of the proposed contracts, the Sellers themselves, in their affidavits supporting the TRO, swore that they were the owners of the agency and stated that there had been negotiations between the parties for the sale of the agency but the terms were never agreed upon.

Alternatively, the Sellers argue that there was an implied contract because the Buyers paid for the agency and Sellers relinquished control. "[A] contract implied in law is imposed by operation of law, without regard to the assent of the parties, on grounds of reason and justice." *Scandlyn v. McDill Columbus Corp.*, 895 S.W.2d 342, 345 (Tenn. Ct. App. 1994) (quoting *Continental Motel Brokers, Inc. v. Blankenship*, 739 F.2d 226, 232 (6th Cir. 1984)). To state a claim under this theory, the plaintiff must allege the following elements:

A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value

thereof. The most significant requirement for a recovery . . . is that the enrichment to the defendant be unjust.

*Haynes v. Dalton*, 848 S.W.2d 664, 666 (Tenn. Ct. App. 1992) (quoting *Paschall's Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 155 (Tenn. 1966)).

We see no evidence Buyers were unjustly enriched. On the contrary, the record shows they expended substantial funds bringing the agency's bills current and expended substantial effort in attempting to run the agency and complete the paperwork necessary to effect the transfer of ownership. In view of the all the surrounding circumstances, no implied in law contract enforceable by Sellers arose because there was no benefit accrued to the Buyers. Again, the jury expressly found the agency belonged to the Sellers and not the Buyers. Therefore, for the reasons stated above, the jury's verdict denying the breach of contract claim is sufficiently supported by the evidence and affirmed.

III.

Next, we turn to the Sellers' assertion that there was insufficient evidence to support the Buyers' claim of conversion. We find the evidence was sufficient to support the claim of conversion.

A conversion, in the sense of the law of trover, is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right.

*Paehler v. Union Planters Nat'l Bank*, 971 S.W.2d 393, 398 (Tenn. Ct. App. 1997) (quoting *Mammoth Cave Prod. Credit Ass'n v. Oldham,* 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)).

The record shows Sellers accepted $10,000 from Buyers in April 1997. In June, Sellers swore in affidavits supporting their motion for a TRO they were the owners of the agency. In July, Buyers demanded the return of the $10,000 they paid Sellers for the agency. Sellers ignored the demand and kept the money. This evidence is sufficient to support a claim for conversion.

IV.

The record also refutes Sellers' assertion that the evidence was insufficient to establish Buyers' claim regarding abuse of process.

> To establish a claim for abuse of process in Tennessee, as in a majority of other jurisdictions, two elements must be alleged: (1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.
>
> . . .
>
> The test as to whether there is an abuse of process is whether the process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be compelled to do. Abuse of process does not occur unless the process is perverted, i.e., directed outside of its lawful course to the accomplishment of some object other than that for which it is provided. . . . The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club.

*Bell v. Icard, Merrill, Cullis, Timm, Furen & Gins*, 986 S.W.2d 550, 555 (Tenn. 1999) (citations omitted).

The record shows after accepting $10,000 in payment for the agency, Sellers obtained the TRO enjoining Buyers from operating the business. Sellers stated in the supporting affidavit that they had demanded the Buyers cease operating the business and were refused, even though they had first made such demand the day they filed the TRO and Ms. Jarmakowicz complied. They also swore that Ms. Jarmakowicz had made disparaging remarks about them to bank personnel which was refuted in the record by the bank personnel. Once business was halted and the agency's reputation was damaged to the point customers were making police reports, Sellers withdrew the TRO and their complaint and unilaterally decided the sale had been finalized. This evidence is sufficient to show Sellers perverted the legal process to achieve a purpose other than that for which it was intended and committed an act not proper in the course of litigation. *Bell*, 986 S.W.2d at 555.

Sellers argue Buyers' failure to have the ARC account transferred into Buyers' names justified their actions. The jury disagreed. The record contains no evidence that Buyers intended to exploit Sellers' connection to the ARC or to harm the agency. On this record, we are not authorized to alter the verdict because there is material evidence to support it.

11

V.

Sellers also contend that the evidence of fraud and deceit was insufficient to support the jury's verdict. We disagree. This court has previously identified the elements of the common law action of fraud and deceit:

When a party intentionally misrepresents a material fact or produces a false impression in order to mislead another or to obtain an undue advantage over him, there is a positive fraud. The representation must have been made with knowledge of its falsity and with a fraudulent intent. The representation must have been to an existing fact which is material and the plaintiff must have reasonably relied upon that representation to his injury.

*Godwin Aircraft, Inc. v. Houston*, 851 S.W.2d 816, 821 (Tenn. Ct. App. 1992) (quoting *Haynes v. Cumberland Builders*, 546 S.W.2d 228, 231 (Tenn. Ct. App. 1976)) (citations omitted).

To the extent that Sellers argue that they made no misrepresentations of existing fact, we note that Tennessee courts also now recognize the tort of promissory fraud. *Oak Ridge Precision Indus., Inc. v. First Tennessee Bank Nat'l Ass'n*, 835 S.W.2d 25, 29 n. 1 (Tenn. Ct. App. 1992); *Steed Realty v. Oveisi*, 823 S.W.2d 195, 199 (Tenn. Ct. App. 1991). Under this theory, misrepresentations in order to be fraudulent no longer must be of facts at the time or previously existing, but may include promises for the future. *Steed Realty*, 823 S.W.2d at 199. Actionable fraud can also be based upon a promise of future conduct, so long as it is established that such a promise or representation was made with the intent not to perform. *Id.* (quoting *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn. 1978)).

When considering whether the verdict is supported by material evidence, we must necessarily consider whether that evidence met the applicable standard of proof. While Tennessee courts have appeared to disagree over the issue of whether the burden of proof required to prove fraud is a clear and convincing or a preponderance standard,[3] we believe the claimant asserting the tort of fraud and deceit in an action for damages must only meet a preponderance of the evidence burden of proof.[4]

---

[3]For a thorough discussion of the cases stating each of the differing burdens *see Gentry v. Hill*, (no docket no. available) 1985 Tenn. App. LEXIS 3180 at *6-11 (Tenn. Ct. App. Sept. 25, 1985) (no Tenn. R. App. P. 11 application filed); *see also Johnson v. McWhirter*, No. CA 46, 1988 WL 5685 at *3 (Tenn. Ct. App. Jan. 29, 1988) (no rule 11 Tenn. R. App. P. application filed) (finding it unnecessary to determine which measure of proof applied, but noting differing holdings).

[4]*See Gentry*, 1985 Tenn. App. LEXIS 3180 at *6-11; *Piccadilly Square v. Intercontinental Constr. Co., Inc.*, 782 S.W.2d 178, 184 (Tenn. Ct. App. 1989); *Short v. Louisville and Nashville R.R. Co.*, 213 F. Supp. 549, 551 (E.D. Tenn. 1962); *see also*, Tennessee Jurisprudence, *Fraud and Deceit* § 38 (1984 and Supp.), ("Tennessee law requires proof of fraud by only a preponderance of the evidence.") (citing *Atkins v. Kirkpatrick*, 823 S.W.2d 547 (Tenn. Ct. App. 1991); *Calhoun v. Baylor*, 646 F.2d 1158, 1163 (6th Cir. 1981); *Bennett v. Massachusetts Mut. Life Ins. Co.*, 64 S.W. 758 (1901); *Gage v. Railway Co.*, 14 S.W. 73 (1890); *McBee v. Bowman*, 14 S.W. 481 (1890);

(continued...)

12

We agree with this court's holding in *Gentry v. Hill*, (no docket no.) 1985 Tenn. App. LEXIS 3180 at *6-11 (Tenn. Ct. App. Sept. 25, 1985) (no Tenn. R. App. P. 11 application filed), where, after reviewing various holdings on the applicable burden of proof and determining "about the only thing that is clear is that the rule to be applied is unclear," this court concluded "the preponderance of the evidence rule is the better one and will better serve the interests of justice." *Id*. at *8.

A number of cases finding that fraud must be proved by clear and convincing evidence involve attempts to set aside or reform a written instrument. *See, e.g., Dickey v. Nichols*, No. 01A01-9007-CH00260, 1991 WL 16918 at *5 (Tenn. Ct. App. Sept. 4, 1991) (no Tenn. R. App. P. 11 application filed) ("In order to justify reformation, the evidence of mistake or fraud must be clear and convincing"); *Russell v. Zanone*, 55 Tenn. App. 690, 704, 404 S.W.2d 539, 545 (Tenn. Ct. App. 1966) (In a suit seeking to set aside a promissory note and enjoin enforcement of a judgment based on that note, the court reviewed the various descriptions of the applicable standard, including "clear and satisfactory" and "clear, cogent and convincing").[5] As this court has stated, such cases are not applicable to a tort cause of action for fraud and deceit where rescission of a document or instrument is not involved. *Cavallo v. University of Tennessee, Memphis*, No. 01-A-01-9206-CH00210, 1992 WL 312620 at *4 (Tenn. Ct. App. Oct. 30, 1992) (no Tenn. R. App. P. 11 application filed).

General language in some opinions concerning the type of proof necessary to demonstrate fraud is based upon the law's presumption of fair dealing. "Fraud is never presumed, it must be clearly proved, the burden of proof is on the complainant . . ." *Williams v. Spinks*, 7 Tenn. App. 488 (1928). Such language describes the type or quality of the proof necessary. When faced with tort fraud and deceit claims, the quality of the evidence must not be such to lead to a verdict based on conjecture, surmise or speculation. *Gold v. National Sav. Bank*, 641 F.2d 430, 435 (6th Cir. 1981) and *A.J. White v. Bettis & Capps*, 56 Tenn. 645 (1872).

> Fraud is never presumed; the presumption, rather, is in favor of good faith and honesty and against fraud. Thus parties alleging fraud must establish their charges by a preponderance of the evidence and not leave the matter to mere speculation or guess.

---

[4](...continued)
and *Stone v. Manning*, 52 S.W. 990 (1899)).

[5]*See also Jones v. Seal*, 409 S.W.2d 382 (Tenn. Ct. App. 1966) (an action to set aside an executed deed on the grounds of fraud); *Williams v. Spinks*, 7 Tenn. App. 488 (1928) (an action to set aside a lease executed by the parties on the grounds of fraud); and *A.J. White v. Bettis & Capps*, 56 Tenn. 645 (1872) ("fuller proof" needed than in the ordinary civil case to set aside a deed on fraudulent conveyance grounds). We do not disagree that clear and convincing evidence is required in such situations. Similarly, where fraud is the ground asserted for relief from judgment under Tenn. R. Civ. P. 60.02, the party seeking to undo the finality of a judgment must prove fraud by clear and convincing evidence. *See Safeco Ins. Co. of America v. Shaver*, No. 01A01-9301-CH-00005, 1994 WL 481402 at *5 (Tenn. Ct. App. Sept. 7, 1994) (no Tenn. R. App. P. 11 application filed).

13

*Short v. Louisville and Nashville R.R. Co.*, 213 F. Supp. 549, 551 (E.D. Tenn. 1962) (citations omitted). Thus, the plaintiff's burden in proving fraud has been described by the type or quality of proof required:

> The general rule is that the evidence to be sufficient to establish fraud should prove a state of facts which is not fairly and reasonably reconcilable with fair dealing and honesty of purpose, and which would lead a reasonable man to the conclusion that fraud in fact existed.

*Williams v. Spinks*, 7 Tenn. App. at 488.

Such language regarding the type or quality of proof, however, does not change the burden of proof. For example, where witnesses contradict each other, it is sufficient that one witness's testimony, if believed by the factfinder, establishes facts and circumstances sufficient to convince a reasonable person that fraud has occurred. *Cavallo v. University of Tennessee, Memphis*, 1992 WL 312620 at *4.

In the case before us, because it does not involve an attempt to set aside a written contract, a preponderance of the evidence standard applied, and we review the jury's verdict based on that burden. The fraud and deceit or misrepresentations alleged herein involve the oral representations as to the assets and liabilities of the company to be transferred and, although the record includes conflicting testimony on these and other facts, we must take the strongest legitimate view of the evidence which favors the jury's verdict.

The record shows during negotiations for the purchase of the agency, Sellers promised that one of items included in the purchase price was the operating account. On the day of the transaction, Ms. Jarmakowicz called the bank and was assured the operating account contained over $954, almost 1/10 of the purchase price. It is undisputed after the $10,000 purchase price was paid, Mrs. Suddarth withdrew all the funds from the operating account, paid her sister $25, and kept the remainder. The record also shows that during the negotiations, Sellers promised all bills would be current, but after accepting payment of the full purchase price, they presented Ms. Jarmakowicz with a number of overdue bills, in an amount exceeding $7000. In reliance on representations or promises made prior to paying the purchase price, Buyers paid $10,000 for the agency. From this proof, a jury could find that Sellers misrepresented the agency's assets and liabilities being transferred in exchange for $10,000. Whether the Sellers misrepresented a material existing fact as to the current assets and liabilities of the business or misrepresented their intention to transfer certain assets but not certain liabilities is immaterial, because a claim of fraud may be predicated on either.

Sellers argue that because Ms. Jarmakowicz had access to the agency records, she could not have reasonably relied on any financial information conveyed to her by Sellers. The record shows Ms. Jarmakowicz did not have unfettered access to all the records and accounts before she paid Sellers. Even if she had, Mrs. Suddarth promised the bills would be made current and the record shows Sellers had income from various sources and appeared to be able to perform that promise.

14

Again, there is material evidence in the record from which the jury could have found that the Buyers reasonably relied on the misrepresentations. The evidence from the record is sufficient to affirm the verdict on the fraud and deceit claim. Tenn. R. App. P. 13(d).

## VI.

Buyers maintain the trial court erred in directing a verdict on the punitive damages issue. The law governing directed verdicts is well settled.

> In reviewing a motion for directed verdict, "the trial court must take the strongest legitimate view of the evidence in favor of the non-moving party, allowing all reasonable inferences in favor of that party, and disregarding all countervailing evidence." *Wasielewski v. K Mart Corp.*, 891 S.W.2d 916, 919 (Tenn. Ct. App. 1994). A directed verdict should only be granted in cases "where a reasonable mind could draw but one conclusion." *Holmes v. Wilson,* 551 S.W.2d 682 (Tenn.1977).

*Hughes v. Lumbermens Mut. Cas. Co., Inc.*, 2 S.W.3d 218, 227 (Tenn. Ct. App. 1999). Further, the judge should not weigh the evidence as a thirteenth juror when determining whether a directed verdict is appropriate. *Wasielewski*, at 919; *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992).

The rules regarding punitive damages are also well-settled, and such damages are appropriate only where the record supports a clear and convincing finding that the case is one of the most "egregious" of wrongs *and* "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn. 1992). Our courts have defined the meaning of these terms within this context:

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Id.* (citations omitted).

In the case before us, the trial court allowed the jury to consider Buyers' claims of fraud and deceit, abuse of process, and conversion, and later approved the jury's verdicts against the Sellers on those claims. This approval included, at the least, an implicit finding the Buyers had shown by a preponderance of the evidence that Sellers had acted intentionally and/or fraudulently. Buyers

15

assert that the same conduct by the Sellers that the jury and judge found sufficient to subject them to liability for compensatory damages was also sufficient to withstand a motion for directed verdict on punitive damages.

There is certainly some logic in Buyers' argument. However, their argument would necessitate a conclusion that in every action for fraud or misrepresentation, or in every action based on an intentional tort, or in every case where the underlying cause of action requires a showing of fraudulent, intentional, malicious, or reckless conduct, a directed verdict for defendants on punitive damages is never appropriate where liability for compensatory damages is allowed to go to the jury. That is simply not the law. There are a number of cases where compensatory damages for fraudulent conduct have been awarded and upheld and punitive damages denied. *See, e.g., Gage v. Seaman*, No. 03A01-9711-CH-00503, 1999 WL 95185 (Tenn. Ct. App. Feb. 23, 1999) (no Tenn. R. App. P. 11 application filed). While an award of punitive damages must be based on the same conduct warranting the award of compensatory damages, *Metcalfe v. Waters*, No. 02A01-9510-CV-00236, 1996 WL 622696 at *6 (Tenn. Ct. App. Oct. 29, 1996) (reversed in part on other grounds, 970 S.W.2d 448), the converse is not true. Fraudulent, intentional, malicious, or reckless conduct which warrants an award of compensatory damages does not necessarily qualify for an award of punitive damages.

Our Supreme Court has made it clear that punitive damages and compensatory damages serve different purposes, "the primary purpose of a punitive award is to deter misconduct, while the purpose of compensatory damages is to make the plaintiff whole." *Hodges v. S.C. Toof*, 833 S.W. 2d at 901. Because of these different purposes, punitive damages are appropriate only in the "most egregious" of cases. *Id.* The Court has also clearly determined that restricting the availability of punitive damages to the worst situations is more likely to maintain such damages as "an effective deterrent of truly reprehensible conduct." *Id.* The conduct justifying punitive damages must be proved by clear and convincing evidence, a standard which poses a higher burden on the plaintiff than preponderance of the evidence.[6]

> This higher standard of proof is appropriate given the twin purposes of punishment and deterrence: fairness requires that a defendant's wrong be clearly established before punishment, as such, is imposed; awarding punitive damages only in clearly appropriate cases better effects deterrence.

*Id.*

This court has recognized the appropriateness of a directed verdict on punitive damages while allowing the jury to determine liability and award compensatory damages on the basis of the higher burden of proof required to support punitive damages and on the basis of the differing character of conduct necessary to meet the Supreme Court's requirement that only the most egregious conduct

---

[6]"Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges*, 833 S.W.2d at 901, n. 3.

warrants punitive damages. *See, e.g., Nelms v. Walgreen Co.*, No. 02A01-9805-CV-00137, 1999 WL 462145 at *2-4 (Tenn. Ct. App. July 7, 1999) (no Tenn. R. App. P. 11 application filed) (plaintiff failed to proved by clear and convincing evidence that defendant acted recklessly although plaintiff established negligence by a preponderance of the evidence, and the trial court properly directed a verdict for the defendant on punitive damages at the close of the proof).

When a court is called upon to determine a motion for directed verdict on punitive damages, the court is "required to determine whether there was material evidence of a clear and convincing nature to support an award of punitive damages," while still taking the strongest legitimate view of plaintiff's evidence. *Wasielewski,* 891 S.W.2d at 919.

> When considering a motion for directed verdict on punitive damages, a trial court must limit consideration of the evidence in light of this standard, but it must also find the evidence to be clear and convincing.

*Hughes v. Lumbermens Mut. Cas. Co., Inc.*, 2 S.W.3d at 227 (citations omitted).

In deciding whether the evidence was clear and convincing, the court is guided by the attempts at distinguishing this standard from other evidentiary burdens:

> [a]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. Such evidence should produce in the factfinder's mind a firm belief or conviction as to the truth of the allegations sought to be established. In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not.

*Nelms,* 1999 WL 462145 at *3 (citations omitted).

In the case before us, the trial court was required, in ruling on the motion for directed verdict, to determine whether reasonable minds could draw only one conclusion: that the Sellers conduct was not so egregious as to warrant punishment or deterrence. In so finding, the trial court implicitly reached the conclusion that the evidence was not sufficient to eliminate any serious or substantial doubt that the Sellers did not act fraudulently, intentionally, maliciously, or recklessly.

The arguments made at trial and the court's responses provide some insight into the directed verdict issue. At the close of the Buyers' proof, the Sellers moved for a directed verdict on liability, asserting that the Buyers were the owners of the agency because they assumed the role of owners and that the TRO was necessary to protect the Sellers' line of credit. Sellers also moved for directed verdict on punitive damages, asserting Buyers had not carried their burden of proof on that issue

17

under *Hodges v. S.C. Toof*. The court denied the motion. However, with regard to the punitive damages issue, the court made it clear that unless stronger proof was deduced in the remaining trial it was inclined to direct a verdict on punitive damages at the close of the evidence. At the close of all the proof, the Sellers again moved for directed verdict as to punitive damages. The Buyers' argument was based exclusively on the abuse of process claim. The Buyers argued that the Sellers obtained the TRO solely for negotiation purposes. In granting the motion, the court made it clear that it was aware of the high standard which must be met for punitive damages and determined that the evidence simply did not rise to the level of clear and convincing. The trial court, having heard all the evidence and viewed all the witnesses, was firm in its reasoning and decision.

Having reviewed all the evidence in the record as well as the arguments on the motion, we agree with the trial court. While the Buyers maintained Sellers had an ulterior motive in seeking the TRO, Sellers testified that they were contacted by the bank about an overdraft on the ARC account and were concerned that their line of credit was in jeopardy. Buyers had not at that time completed arrangements to transfer the ARC account out of Sellers' names and into their own. Thus, the entire set of circumstances surrounding the dealings between the parties, as well as those surrounding Sellers' recourse to the court for a TRO, preclude a determination that no serious doubt existed about Sellers' motives for seeking the TRO. The fact that there is sufficient evidence in the record for the jury to have found abuse of process does not require a conclusion that the evidence was clear and convincing on the type of conduct necessary to warrant punitive damages. Our review of the entire record also convinces us that the appropriate goal, making Buyers whole through an award of compensatory damages, was fulfilled, and that there was no basis for pursuing the goals of punishment or deterrence.[7]

VII.

Buyers argue the trial court abused its discretion by denying their request for discretionary costs.

Tenn. R. Civ. P. 54.04, vests trial courts with wide discretion in awarding discretionary costs. *See Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998). That Rule provides in pertinent part:

(1) Costs included in the bill of costs prepared by the clerk shall be allowed to the prevailing party unless the court otherwise directs, but costs against the state, its officers, or its agencies shall be imposed only to the extent permitted by law.

(2) Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert

---

[7]We note that the jury awarded the Buyers $25,365 in compensatory damages. Buyers had requested $50,000 in their complaint, but reduced the request to $30,769.50 through testimony at trial.

witness fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs. Subject to Rule 41.04, a party requesting discretionary costs shall file and serve a motion within thirty (30) days after entry of judgment. The trial court retains jurisdiction over a motion for discretionary costs even though a party has filed a notice of appeal. The court may tax discretionary costs at the time of voluntary dismissal.

Tenn. R. Civ. P. 54.04. Although trial courts generally award costs to the prevailing party provided a timely, properly supported motion was filed, an award of costs is not automatic. *See Sanders*, 989 S.W.2d at 345.

Instead, trial courts are free to apportion costs between the litigants as the equities of each case demand. Accordingly, if any equitable basis appears in the record which will support the trial court's apportionment of costs, this court must affirm. Moreover, on appeal, the appellant bears the burden of showing that the trial court abused its discretion in its assessment of costs.

*Sanders*, 989 S.W.2d at 345 (citations omitted).

The Supreme Court, in *Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 145 (Tenn. 1981), defined "abuse of discretion" as follows:

The term has too often implied intentional wrong, bad faith or misconduct on the part of a trial judge. In our view, "abuse of discretion" was never intended to carry such a meaning, nor to reflect upon the trial judge in any disparaging manner. To us the phrase simply meant an erroneous conclusion or judgment on the part of the trial judge--a conclusion that was clearly against logic (or reason) and not justified.

Even considering the discretion given to the trial court, as evidenced by our holding in *Sanders*, this court has established some general guidelines by which we review decisions regarding discretionary costs. "Unless the requested costs are unreasonable, courts generally award them to prevailing parties who file timely, properly supported motions." *Dent v. Holt*, No. 01A01-9302-CV00072, 1994 WL 440916 at *3 (Tenn. Ct. App. Aug. 17, 1994) (modified on rehearing, 1994 WL 503891 (Tenn. Ct. App. Sept. 16, 1994). Where the record does not include any basis for denial of the costs, we have reversed the trial court's denial and remanded for a determination of whether the costs were reasonable. *Id.*

The record shows Buyers filed a timely motion for discretionary costs supported by an affidavit itemizing and verifying $7,346.70 in expenditures for copying documents, creating exhibits, taking depositions and faxing documents. The Sellers responded that such costs were not warranted because they had tried to settle the matter before and during the trial, they had successfully defended the punitive damages claims, and that the jury had awarded the Buyers less than requested in compensatory damages. The trial court summarily denied the motion, even though Buyers were

clearly the prevailing party on their tort claims and on the counterclaim and their motion was timely filed and adequately supported. The record provides no rationale for the trial court's decision. Therefore, we are unable to determine whether the trial court's decision was justified. Further, we have no record concerning the reasonableness and necessity of the costs sought, necessarily limiting our ability to review the trial court's decision. Therefore, we vacate the trial court's denial of the Buyers' request for discretionary costs and remand that issue to the trial court.

VIII.

Accordingly, the judgment of the trial court on the claims alleging fraud and deceit, conversion and abuse of process and the dismissal of the counterclaim alleging breach of contract are affirmed. The trial court's decision to grant the Suddarth's motion for directed verdict on the punitive damages claim is also affirmed. The trial court's denial of Ms. Jarmakowicz and Mr. Heeney's motion for discretionary costs is vacated. This case is remanded for further proceedings on the motion for discretionary costs consistent with this opinion. Costs of this appeal and cross-appeal shall be taxed equally to Mr. and Mrs. Suddarth, on one hand, and Ms. Jarmakowicz and Mr. Heeney, on the other, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE