IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 16, 2005 Session

# CAPITAL MANAGEMENT PARTNERS v. WILLIAM J. EGGLESTON, III

**A Direct Appeal from the Chancery Court for Shelby County**
**No. 99-0753-2     The Honorable Arnold B. Goldin, Chancellor**

---

**No. W2004-01207-COA-R3-CV - Filed July 7, 2005**

---

Plaintiff-corporation sued defendant, a stockholder, officer, and director of a corporation engaged in the design and manufacture of stereo speakers, to recover the amount due on loans made to the corporation allegedly based on negligent and fraudulent misrepresentations of the defendant. The pleadings also seek to pierce the corporate veil and hold the defendant personally liable for the corporation debts. The trial court found no fraud or misrepresentation on the part of the defendant and entered judgment for the defendant. Plaintiff appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

Robert F. Miller of Memphis for Appellant, Capital Management Partners

John R. Branson of Memphis for Appellee William J. Eggleston, III

## OPINION

## I. PROCEDURAL HISTORY

On August 23, 1999, Capital Management Partners, a Minnesota Corporation, filed its original complaint against the Defendant, William J. Eggleston III, in the Chancery Court of Shelby County, asserting claims for fraudulent misrepresentation in a commercial transaction and negligent misrepresentations in a commercial transaction. On September 23, 1999, Eggleston filed a motion to dismiss the original complaint. On May 1, 2000, Capital Management filed its amended complaint. On August 25, 2000, Eggleston filed his answer to the amended complaint in which he denied the substantive allegations and asserted various affirmative defenses. He also filed a countercomplaint asserting he was entitled to money damages from plaintiff.

On December 12, 2000, the chancery court entered a consent order to consolidate two cases, pursuant to which the instant case was consolidated with *Eggleston Audio, LLC v. William J. Eggleston, III*. On October 22, 2003, Capital Management filed its answer to Eggleston's countercomplaint, denying its substantive allegations. On October 30, 2003, Capital Management filed its second amended complaint in which it added a claim stating that Eggleston acted as the alter ego of Eggleston Works and seeking to pierce the corporate veil. Eggleston filed his answer to the second amended complaint, denying the allegations.

The trial of the consolidated case was conducted from November 4, 2003 through November 7, 2003. After the trial, the parties submitted their proposed findings of fact and conclusions of law. The chancery court ruled against Capital Management on all counts.[1]

## II. FACTS

This appeal arises from the collapse of Eggleston Works Loudspeaker Company ("Eggleston Works"), a Memphis-based firm that manufactured high-end audio speakers for a discriminating clientele of audiophiles (persons who, according to Merriam-Webster Dictionary, are "enthusiastic about high-fidelity sound reproduction"). Eggleston Works was founded by William J. Eggleston, III ("Eggleston"), soon after he left college. After a few rocky years, Eggleston Works ultimately succeeded in gaining the respect of the audiophile community for the high quality of its speakers, which received rave reviews in a leading publication devoted to high-end audio equipment. Despite this acclaim, Eggleston Works was never a profitable company, and in 1999, in the midst of a dispute with Capital Management Partners ("CMP"), Eggleston filed for bankruptcy protection for Eggleston Works. Capital Management Partners then sued Eggleston for fraudulent misrepresentation in a commercial transaction and negligent misrepresentation in a commercial transaction. Because the factual background of this case is complex and the sufficiency of the evidence is at issue, it is necessary for us to recite the history of Eggleston Works, as brought forth at trial, in detail.

### A.     1992-1994: Early years of Eggleston Works

Eggleston began building speakers at the age of fourteen as a hobby that he pursued with his father, the pioneering photographer William Eggleston. Eggleston testified that, while still in high school, he had ambitions of founding a company that would make audio speakers. Eggleston attended college at Boston University, Memphis State University, Georgetown University, and American University, but never earned a college degree. While attending Georgetown in 1990, where he studied business, Eggleston had access to a woodworking shop and used it to build his first speaker, which he called "Entail," that was designed to look like furniture. Finding his process for building the Entail too arduous (it took nine months to complete the first set of speakers), Eggleston turned to a design that was easier to build, and in 1991 he began talks with a friend, Michael Grant, about starting a speaker company together. Eggleston explained his idea for furniture-designed speakers to Grant, and proposed that they start a company to make them. Eggleston sent Grant a pair

---

[1]     Eggleston Audio, LLC, did not appeal from the trial court's adverse judgment against it.

of pedestal speakers and Grant "got really excited about them." In 1992, Eggleston and Grant became very serious about starting the company. In the summer of 1992, Eggleston and Grant moved to Memphis to start Eggleston Works, incorporating in Tennessee in the fall of 1992. Grant was the primary investor for the company, investing $50,000 initially, but within a year, he had invested $200,000. In 1992, Eggleston Works was based in a rented house in Memphis, and Eggleston and Grant made a deal to trade speakers with the owner of a woodworking shop in downtown Memphis, in return for the use of the shop to build speakers. Toward the end of 1992, Eggleston Works built prototypes of its speakers to take to the January 1993 Consumer Electronics Show (CES) in Las Vegas. At the 1993 CES, Eggleston Works signed up Peter McGrath, an important dealer in high-end audio equipment, as an Eggleston Works distributor, and shortly after the show the company was mentioned in *Stereophile*, a prestigious magazine catering to the audiophile community. Upon returning from the CES, Eggleston and Grant rented a shop at 125 Talbot in Memphis, where they went to work filling their first order, placed by Peter McGrath.

At this time, the first half of 1993, Grant did all the accounting and bookkeeping for Eggleston Works, while Eggleston and his brother, Winston, worked in the shop. But after signing up Peter McGrath, who immediately sold a pair of Eggleston Works speakers, they had not signed up any more dealers. In the summer of 1993, Eggleston took to the road, renting a van and visiting audio dealers across the country in an effort to persuade them to carry Eggleston Works' furniture-styled speakers. Despite spending six weeks on the road, Eggleston failed to sign up a single dealer. But during his travels Eggleston did conceive of a new speaker design—"a compact floor-standing speaker that was very expensive"—that he would call the "Andra" speaker.

In early 1994, Michael Grant ceased being actively involved in Eggleston Works, but kept his ownership interest. Eggleston spent the first six months of 1994 designing the first prototype of the Andra speaker.

## B. 1994-1997: The success of the Andra speaker

In the fall of 1994, Eggleston Works was preparing to debut the Andra speaker at the CES to be held in January 1995. Eggleston recruited Peter McGrath, the high-end audio dealer who had been Eggleston Works' first distributor and who had decided to leave his store in Miami, to lead the Eggleston Works sales team. Concerned about how Eggleston Works would be able to fulfill any orders it might receive at the 1995 CES, Eggleston began approaching Memphis banks in an attempt to secure a Small Business Administration loan. At the January 1995 CES, Eggleston Works signed up fifteen dealers who placed a total of $110,000 in orders, but Eggleston Works had still not secured a loan. In February 1995, National Bank of Commerce in Memphis agreed to loan Eggleston Works $120,000, if a guarantor could be found for part of the loan. Diego Winegartner, a friend of Eggleston's, agreed to guarantee $100,000 of the loan in exchange for a set of speakers and photographs by Eggleston's father. By late spring, Eggleston Works had produced eight or nine pairs of Andras. In the spring of 1995, Eggleston testified, the company had "momentum" and had delivered a set of Andras to the reviewer for an audio magazine, but lack of funds caused the company to "stall" at the beginning of summer. During the summer, Eggleston went to Asia to seek

investment money from his foreign distributors. At that time, most employees of the cash-strapped Eggleston Works were deferring their salaries.

In the fall of 1995, Eggleston had a discussion in New York City with an old friend and investment banker, Alex Bolen, about the possibility of Bolen and his friends (the "Bolen Group") investing approximately $300,000 in Eggleston Works. Eggleston secured a letter of intent from the Bolen Group to invest $300,000. Between fall 1995 and July 1996, a favorable review of Eggleston Works speakers by a well-respected writer appeared in an audio magazine, and by July 1996, the Bolen Group had invested $225,000 in Eggleston Works. Cash flow was still very tight; Eggleston Works occasionally missed its payroll; and Eggleston was not always able to pay himself. Due to these ongoing financial problems, Eggleston spoke to Alex Bolen and Bolen's colleague John Sabre (part of the Bolen Group) and they agreed to collectively sign a letter of credit for $360,000—which Eggleston Works received at the end of 1996. This money went into operations of the company.

By the start of 1997, when the 1997 CES show was held, Eggleston Works had signed up more dealers and distributors, and the staff of *Stereophile* magazine had entered into discussions with Eggleston Works about reviewing the Andra speaker. Eggleston testified that this review promised to boost the profile of Eggleston Works considerably: "When I started my company, if you had asked me one goal I had, it would be to be on the cover of Stereophile.... If you got a good review in Stereophile, you had made it." By spring of 1997, Eggleston Works was shipping, in Eggleston's estimation, around eight or nine Andras a month and Eggleston testified that the woodshop was operating at maximum capacity. Eggleston Works was building speakers with the use of a computer numerically controlled router (CNC router), a router that cuts wood according to plans that have been input into a computer. The router used at that time had a lower capacity and lower accuracy than was ideal for Eggleston Works, and Eggleston Works was receiving some complaints from customers about the workmanship in their speakers. In the spring of 1997, Eggleston approached the Bolen Group, which had already invested $225,000 and signed a $360,000 letter of credit, about the possibility of acquiring a more accurate, higher capacity router. They originally settled on a budget of $30-$60,000 for a router, but Eggleston and the Bolen Group ultimately settled on a $160,000 router, which Eggleston Works acquired by a lease-purchase agreement. The Bolen Group guaranteed the entire $160,000 cost of the router. It became apparent that the new router was too large to fit in the Eggleston Works shop on Talbot Street, and as a result, Eggleston Works began looking for a new space, and moved to a building on South Front Street in downtown Memphis.

Around this time, Eggleston and McGrath traveled to Santa Fe, New Mexico to meet with the reviewer for *Stereophile* magazine. The *Stereophile* review, which Eggleston anticipated to be positive, seemed likely to boost the company's profile and increase sales.

### C.    Fall 1997: Investment by Mike Sabre/Capital Management Partners

In the fall of 1997 Eggleston Works still had cashflow problems, and Eggleston began speaking with John Sabre (of the Bolen Group) in an attempt to secure a loan for the company. John Sabre and other members of the Bolen Group were unwilling to invest any more funds in Eggleston

Works, but in late August or early September of 1997, John Sabre put Eggleston in touch with his brother, Mike Sabre ("Sabre"), who had a firm called Capital Management Partners in Minneapolis that invested money in small private companies. According to his own testimony at trial, Sabre was a highly educated and sophisticated businessman from the inception of his relationship with Eggleston. He held an undergraduate degree in political science and economics from the University of Minnesota and an M.B.A. from UCLA. Before founding Capital Management, Sabre had worked for Apache Oil Corporation as a loan compliance officer; for a venture capital firm called Westwood Partners where he evaluated start-up firms in a variety of fields; and for J.P. Morgan, where his duties included preparing financial statements for the billion-dollar financing of a Latin American coal-mining venture and evaluating a heavy industry business in Mexico City that was seeking to move into new markets. During their initial conversations, Eggleston gave Mike Sabre background information about Eggleston Works, and Sabre asked for a list of assets and other financial information, such as a cash flow statement. Eggleston testified that he told Sabre he "was not in a position to provide accurate information at that time," and that Sabre asked him to "get me [Sabre] anything .... Give me some dirty numbers, anything, give me some idea of where we are." Eggleston sent him a document containing financial statements and projections, reflecting Eggleston Works' negative cash flow. Sabre testified at trial that he was "pleasantly surprised with the detailed complexity and thoroughness of [Eggleston's] numbers." Sabre also got a UCC filing on the assets of the company, which would secure the loan. On October 7, 1997, Sabre funded a loan of $75,000. In that same month, Eggleston Works had a negative cash flow of $77,000, which, according to Eggleston, was due to their efforts to catch up on shipping, master the new CNC router, and fulfill orders. In early December of 1997, Sabre funded another $75,000 loan to Eggleston Works.

In late November 1997, the Andra speaker was featured on a second *Stereophile* cover, this time as "speaker of the year." Flying high from this publicity, Eggleston Works had an extremely successful trip to the January 1998 CES and the company took numerous orders for its products. But soon after the January 1998 CES, Eggleston Works' first interest check to Mike Sabre bounced, which Eggleston attributed to a vendor failing to hold a check that it had promised to hold for a period of time. In February Mike Sabre visited Eggleston Works to examine the company's operations. Eggleston testified that Sabre noticed the negative cash flow in the amount of $245,000, but that he was happy that Eggleston Works had closed out the year with sales of $826,879, a "good sales figure." Eggleston testified that he and Sabre discussed the profit numbers and cash flow numbers in the presence of Tim Duffy, a prospective employee of Eggleston Works.

After Mike Sabre's February visit, John and Mike Sabre called Eggleston and, according to Eggleston, informed him that Eggleston Works (in Eggleston's paraphrase at trial) "looks really good, but you have got administrative problems." Eggleston testified that he agreed with their assessment, and that he believed Eggleston Works would benefit from having a chief financial officer. Mike Sabre then began traveling to Memphis on a weekly basis, an arrangement that excited employees of Eggleston Works because it promised to alleviate the "chaos" (as Eggleston described it) that reigned in the company. Eggleston explained, "it was total chaos in the business and it was explained to everyone with the company that Mike was going to come onboard and he was going to be doing the administrative stuff and I was going to focus more on what I do well and it was going

to be awesome. I was excited about it." One of Sabre's main tasks would be to resolve the question of who had an equity stake in the company. Individuals with claims to stock in Eggleston Works included Eggleston, Michael Grant, Eggleston's brother Winston, the members of the Bolen Group, and Diego Winegartner.

### D.  Spring 1998: Conflict between Eggleston and Sabre

Around the time he entered into the agreement with Sabre in April 1998, Eggleston was working on a new speaker called the "Ivy," which he was designing as a reference speaker for a well-known mastering engineer named Bob Ludwig. The speaker would retail for $100,000 a pair. Eggleston testified that Sabre was opposed to the project and refused to allow funds to go toward the development of the Ivy, and refused to allow the new CNC router to be used in its construction. Eggleston built the speaker without using the CNC router. By May 1998, Eggleston had refined the prototype and was ready to make the first production version of the speaker, but animosity between Sabre and Eggleston was mounting. Eggleston testified that a fissure began to divide Sabre and those loyal to him, and Eggleston and those loyal to him. On June 29, 1998, Sabre put $35,000 into the company. Between June 30 and the end of July, 1998, Sabre put another $80,000 into the company. (Between June 29, 1998 and September 8, 1998, CMP loaned a total of $148,000 to Eggleston Works.) Eggleston was opposed to new policies being implemented by Sabre in an apparent effort to run Eggleston Works "more like a business," policies exemplified by a letter received by Eggleston from an audio dealer who was offended by the brusque treatment he received from Jim Thompson, the Eggleston Works accountant. Eggleston testified, "These were very close personal relationships and Mike was getting in the way of my relationships with these people and just setting a tone for the business that I didn't think was conducive to drawing the revenues of the business."

### E.  Summer 1998: Showdown between Eggleston and Sabre

In August, 1998, a meeting was held in New York City, attended by Eggleston, Mike Sabre, and the Bolen Group. At trial, Eggleston contended that he called this meeting "because I told the Bolen Group I couldn't live with Mike anymore." Sabre contended that he called the meeting to address questionable expenses incurred by Eggleston. Prior to the meeting, Sabre sent Eggleston a memorandum detailing the questionable expenses that he expected Eggleston to explain at the meeting. At the meeting, Eggleston responded to Sabre's allegations by producing receipts and offering explanations for the questioned expenses. He produced documentation for the expenses in the form of a three-ring binder (referred to at trial as "the black book"). Eggleston failed to persuade those in attendance to force Sabre out of the company, and the result of the meeting was that Eggleston's role at Eggleston Works would henceforth be severely diminished—Eggleston was demoted to new product development team leader; he was not to appear at the factory on a daily basis; he was to cease all daily operational decisionmaking regarding sales, production, and finance; his salary was reduced to $30,000 a year; he was to transfer check signing and money transferring rights to Sabre; and various individuals were asked to waive their interest in stock of the company. Eggleston was to retain a 10% interest in the company.

After the August meeting, Eggleston traveled to Europe to "regroup" with a friend. While in Europe, he testified, he did some work for Eggleston Works—for example, he worked on the design for the Ivy, Jr. speaker and he "schmoozed" with an Eggleston Works distributor in France. During his time in Europe, Eggleston communicated with Sabre via e-mail. Eggleston returned from Europe in December 1998. Eggleston planned to attend the January 1999 CES, but before participating, he demanded that Sabre sign an agreement, drafted by Eggleston's attorney, resolving outstanding issues concerning Eggleston's role in Eggleston Works. Among other things, the agreement freed Eggleston from non-competition restrictions, gave Eggleston ownership of his own inventions and innovations, and set parameters for Eggleston's continued employment with Eggleston Works as new product development team leader. Due to his negotiations with Eggleston over the agreement, Sabre did not sign the agreement until the last day of the CES, according to Eggleston. Thus Eggleston only participated in the show for a half-day.

After the 1999 CES, Eggleston testified, he received several communications from Sabre, including a sixty-page proposed agreement that would resolve the disputes between Eggleston and Sabre. Eggleston declined to sign this agreement. In July of 1999, Capital Management Partners sued Eggleston Works to obtain the assets of Eggleston Works. Eggleston then changed the locks at the Eggleston Works facility on South Main, and he prepared bankruptcy paperwork without filing it. There were brief settlement talks between Eggleston, Mike Sabre, and the Bolen Group, but the talks fell through. On July 26, 1999, Eggleston filed for bankruptcy protection for Eggleston Works, and the company ceased operations for three months.

In November 1999, Sabre purchased the assets of Eggleston Works from the bankruptcy trustee for $8,000 and went into business as Eggleston Audio, making high-end stereo speakers. As of November 4, 2003, the principal and interest owed on the loans by Capital Management to Eggleston Works totalled $601,256.86.

The trial court ruled against Capital Management on all counts. The trial court found that Eggleston had made no misrepresentations of material fact, and it further found that any alleged reliance by CMP and Mike Sabre solely on the financial statements provided by Eggleston was not reasonable; therefore, the trial court held that Eggleston was not liable for fraudulent misrepresentation. The trial court further held that Eggleston was not liable for negligent misrepresentation, since he made no material misrepresentations of fact and Sabre did not reasonably rely upon Eggleston's financial statements. Finally, the trial court held that CMP failed to present evidence that it was entitled to pierce the corporate veil of EW.

**III. ISSUES**

The Appellant, Capital Management Partners, raises the following issues on appeal:

1.      Whether the trial court erred in applying the clear and convincing standard of proof to Capital Management's fraud claim against Eggleston.

2. Whether the trial court erred in finding that Capital Management did not present sufficient evidence to permit it to pierce the corporate veil of Eggleston Works and thereby hold Eggleston personally liable for the debts of Eggleston Works.

3. Whether the trial court erred in finding that Capital Management failed to prove its claims for fraud or negligent misrepresentation against Eggleston.

## IV. STANDARD OF REVIEW

Our standard of review in this non-jury case is de novo upon the record of the proceedings below and there is no presumption of correctness with respect to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn.1996) and Tenn. R.App. P. 13(d). The trial court's factual findings are, however, presumed to be correct and we must affirm such findings absent evidence preponderating to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn.1993). We further note that when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.App .1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id.*; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997). However, in reviewing documentary proof, "all impressions of weight and credibility are drawn from the contents of the evidence, and not from the appearance of witnesses and oral testimony at trial." *Wells v. Tennessee Board of Regents*, 9 S .W.3d 779, 783-784 (Tenn.1999). As a result, appellate courts may make an independent assessment of the credibility of the documentary proof it reviews, without affording deference to the trial court's findings. *See Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 456 (Tenn.1988).

## V. ANALYSIS

1. **Whether the trial court erred in applying the clear and convincing standard of proof to Capital Management's fraud claim against Eggleston.**

The first issue raised by Capital Management Partners on appeal is whether the trial court erred in applying the clear and convincing standard of proof to CMP's fraudulent misrepresentation claim against Eggleston. CMP contends that the proper standard of proof is the preponderance of evidence standard, and as authority for this contention CMP relies principally upon the case of *Estate of Acuff v. O'Linger*, 56 S.W.3d 527 (Tenn. Ct. App. 2001). In *Acuff*, another panel of this Court acknowledged the prevailing state of confusion under Tennessee law concerning the proper standard of proof in fraudulent misrepresentation cases, and we attempted to resolve the confusion by analyzing the opinions in which the preponderance of evidence standard was applied in fraud and misrepresentation cases, and comparing them to similar cases in which the clear and convincing

evidence standard was applied. This Court in *Acuff* (in a passage quoted by CMP in its appeal brief) quoted with approval the following passage from an earlier opinion:

> [W]e believe the claimant asserting the tort of fraud and deceit in an action for damages must only meet a preponderance of the evidence burden of proof. We agree with this court's holding in *Gentry v. Hill*, (no docket no.) 1985 Tenn.App. LEXIS 3180 at *6-11 (Tenn.Ct.App. Sept. 25, 1985) (no Tenn.R.App.P. 11 application filed), where, after reviewing various holdings on the applicable burden of proof and determining "about the only thing that is clear is that the rule to be applied is unclear," this court concluded "the preponderance of the evidence rule is the better one and will better serve the interests of justice." Id. at *8.

> A number of cases finding that fraud must be proved by clear and convincing evidence involve attempts to set aside or reform a written instrument. See, e.g., *Dickey v. Nichols*, No. 01-A-01-9007-CH00260, 1991 WL 169618 at *5 (Tenn.Ct.App. Sept.4, 1991) (no Tenn.R.App.P. 11 application filed) ("In order to justify reformation, the evidence of mistake or fraud must be clear and convincing"); *Russell v. Zanone*, 55 Tenn.App. 690, 704, 404 S.W.2d 539, 545 (Tenn.Ct.App.1966) (In a suit seeking to set aside a promissory note and enjoin enforcement of a judgment based on that note, the court reviewed the various descriptions of the applicable standard, including "clear and satisfactory" and "clear, cogent and convincing"). As this court has stated, such cases are not applicable to a tort cause of action for fraud and deceit where rescission of a document or instrument is not involved. *Cavallo v. University of Tennessee*, Memphis, No. 01-A-01-9206-CH00210, 1992 WL 312620 at *4 (Tenn.Ct.App. Oct.30, 1992) (no Tenn.R.App.P. 11 application filed).

CMP maintains that, since it seeks only damages from Eggleston and does not seek the reform or rescission of a written instrument, the preponderance of evidence standard is the appropriate standard for its fraudulent misrepresentation claim against Eggleston.

Although the law of Tennessee on this question is anything but clear, we conclude that under the rule set forth by this Court in *Acuff v. O'Linger*, the preponderance of evidence standard must be applied in the case at bar. The clear and convincing standard of proof is appropriate to those cases where a party seeks the reform or rescission of a written instrument due to fraudulent inducement. But in all other cases involving claims of fraud, the standard of proof is preponderance of evidence. It is true that some language in *Russell v. Zanone*, 404 S.W.2d 539 (Tenn. Ct. App. 1966), the case primarily relied upon by Mr. Eggleston, does appear to suggest that the clear and convincing evidence standard of proof would be appropriate in a situation similar to the facts of the case at bar; however, the Court's holding in *Russell v. Zanone* concerning the proper standard of proof is ultimately less than clear, with the court citing with approval the statement of the Tennessee Supreme Court, in the case of *Williams v. Spinks*, 7 Tenn. App. 488, 494 (Tenn. Ct. App. 1928), that "[t]he general rule is that the evidence to be sufficient to establish fraud should prove a state of facts which is not fairly or reasonable reconcilable with fair dealing and honesty of purpose, and which

would lead a reasonable man to the conclusion that fraud in fact existed." ***Russell v. Zanone***, 404 S.W.2d at 545.

Although we conclude that CMP is correct in its assertion that the proper standard of proof is the preponderance of evidence standard, we conclude that the trial court's statement that "the better approach is to require clear and convincing proof of fraud" constitutes harmless error. We note that, in its judgment, the trial court stated that CMP failed, under either the preponderance of evidence standard or the clear and convincing evidence standard, to prove its fraudulent misrepresentation claim against Eggleston: "The Court finds that CMP has failed to prove its claim for fraud under either standard of proof." Because the Court found that CMP failed to prove its claim by a preponderance of the evidence, we affirm the judgment of the trial court on this issue.

**2.     Whether the trial court erred in finding that Capital Management did not present sufficient evidence to permit it to pierce the corporate veil of Eggleston Works and thereby hold Eggleston personally liable for the debts of Eggleston Works.**

The next issue CMP raises on appeal is whether the trial court erred in holding that CMP did not present sufficient evidence to permit it to pierce the corporate veil of Eggleston Works and hold Eggleston personally liable for the debts of Eggleston Works. The trial court held:

> The Court further finds that CMP has not presented evidence that it is entitled to pierce the corporate veil of EW. EW was a legitimate company that was engaged in the manufacture and sale of stereo speakers. It was properly organized as a corporation under Tennessee law, paid employees, taxes and vendors, manufactured, marketed and shipped its products, and was not used as a subterfuge in illegal transactions. It had nearly a million dollars invested in it before CMP put in a penny. It had hundreds of dollars in sales the years prior to and after the loans were made. It also received $935,000 from the Bolen Group in capital investments and loans before the first loan from CMP, further proof that it was not an undercapitalized sham. *See **The Oceanics Schools, Inc. v. Barbour***, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003).

In its appeal brief, CMP argues that piercing the corporate veil is justified in this case because Eggleston Works "was a sham through which Eggleston pursued his personal interests and goals to the detriment of his creditors." In its appeal brief, CMP enumerates the ways in which it contends Eggleston Works was a sham:

> ... Eggleston Works (i) was grossly undercapitalized; (ii) did not issue stock certificates; (iii) was used as an instrumentality of William Eggleston; (iv) had corporate assets (cash and the option to purchase the Building) diverted to Eggleston; and, (v) failed to maintain even the most basic of corporate formalities by having annual meetings of directors and shareholders.

In his appeal brief, Eggleston disputes CMP's characterization of Eggleston Works as a sham or alter ego of Eggleston:

> [T]here were many more facts, and more important ones, which favored Eggleston's position: He kept track of salary he deferred when the company did not have the cash to pay him, vs. personal expenses the company paid in his behalf; EW was duly and properly organized under Tennessee law, with a charter and minutes; it had numerous employees; it paid its employees, and paid taxes and vendors; it manufactured, marketed and shipped its products all over the world; and was not used as a subterfuge for illegal transactions.... As even Mr. Sabre had to admit, EW had nearly a million dollars invested in it before CMP put in a penny. At its peak, it had a dozen or more employees. It had its own books, and a bookkeeper (Mr. Thompson, who testified in Mr. Sabre's behalf). It had hundreds of thousands of dollars in sales during the years prior to and after the loans were made. Even Mr. Sabre testified that at one point, "orders were pouring in." He himself told a reporter that he thought it had "tremendous potential." In short, EW was a booming, thriving business. To be sure, it had its problems; in the early days its owners did not always follow strict corporate practices—such as not holding formal meetings when it consisted only of two roommates in a rental house, or when one was peddling speakers from the back of a van; but that does not mean that it had no separate existence from Eggleston, and was a total sham, as CMP was required to prove.

(Internal citations omitted.) To resolve the issue of whether the trial court erred in refusing to pierce the corporate veil of Eggleston Works, we turn to the case of *The Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135 (Tenn. Ct. App. 2003), that was cited by the trial court. In *The Oceanics Schools*, we set forth the criteria to be applied under Tennessee law in determining whether the corporate veil should be pierced. We stated:

> A corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors. A corporation's separate identity may be disregarded or "pierced," however, "upon a showing that it is a sham or dummy or *where necessary to accomplish justice*." A corporation's identity should be disregarded "with great caution and not precipitately." The determination of whether to disregard the corporate fiction depends on the special circumstances of each case, and "the matter is particularly within the province of the trial court." "Generally, no one factor is conclusive in determining whether or not to disregard a corporate entity;" rather, the courts typically rely upon a combination of factors in deciding such an issue. The party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief.
>
> In addressing the issue of piercing the corporate veil, this court has relied upon the factors set forth in *Federal Deposit Ins. Corp. v. Allen*, 584 F. Supp. 386 (E.D. Tenn. 1984):

Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

(Internal citations omitted.) We conclude that the trial court did not err in refusing to pierce the corporate veil of Eggleston Works. It is clear, in the evidence adduced in the voluminous record of this case, that Eggleston Works was not the alter ego of Eggleston. While it is true that some corporate formalities were disregarded during the early years of Eggleston Works' existence, the evidence tends strongly to show that Eggleston Works was a legitimate company with an excellent product and was anything but a sham or alter ego of Eggleston. The high quality of its speakers was touted twice in one year on the cover of a prominent trade magazine; Eggleston Works' cadre of experienced investors were given significant say in how the company was operated, to the extent that they were even consulted when the company made a major equipment purchase; one of these investors, Mike Sabre, was brought to Memphis to attempt to sort out the equity stakes that various individuals held in the company; at its height Eggleston Works had a network of distributors selling its speakers both in the United States and abroad; and Eggleston Works had its own large manufacturing facility in downtown Memphis. These factors strongly suggest that the trial court was correct in refusing to pierce the corporate veil of Eggleston Works. This issue is without merit.

**3.** **Whether the trial court erred in finding that Capital Management failed to prove its claims for fraud and negligent misrepresentation against Eggleston.**

CMP's third issue on appeal is whether the trial court erred in finding that CMP failed to prove its claims for fraud and negligent misrepresentation against Eggleston. The trial court set forth its holdings on these issues as follows:

7)  In Sabre's initial conversation with Eggleston, Eggleston gave a description of himself and his company, and Sabre's brother was on the phone. Upon Sabre's request for numbers that represented the financial state of the company, Eggleston

produced a "Financial Statement and projections" report based on sales for the first seven months of 1997 along with projected numbers for the balance of 1997.... In addition to providing the financial information, Eggleston also told Sabre about the product line produced, the dealers and distributors that he had, and the recent positive media exposure that the company's products had received. All these were accurate representations. The only representation that needs to be analyzed [is] whether or not the financial statement contained misrepresentations of a material fact.

8)      The Court finds that the financial statements provided to Sabre by Eggleston did not contain a misrepresentation of a material fact. The difference between Eggleston's financial statements and the financial statements generated by Jim Thompson—the document Sabre contends to have alerted him to EW's financial situation—is based on different but equally valid, accounting methods and not an attempt by Eggleston to conceal any financial information about EW. There was no misrepresentation of a material fact by Eggleston. The other claims made by Sabre that the leasehold improvements, option on the building and expenses were not disclosed are likewise without merit.

9)      Moreover, any alleged reliance by CMP/Sabre solely on the financial statements provided by Eggleston was not reasonable; indeed, by his own admission Sabre did not rely on them solely. This is evidenced by the facts admitted by Sabre ... and is particularly true of as sophisticated a person as Sabre who was in the private investment business. He testified he had in mind a substantial number of positive and negative pieces of information about EW throughout the time he made the loans he complains of, and the court is not persuaded that there was any fraud, whatever the standard of proof. Even he admits that at some point, he knew enough that he cannot claim fraud; he is seeking no recovery for the advancements he made after the fall of 1998; and yet he continued to pour funds into EW and its successor, EA, up to the time of trial.

10)     The Court further finds that Eggleston is not liable for negligent misrepresentation.... The Court finds that there were no material misstatements of fact, and that Sabre did not reasonably rely on Exhibits 6, 9 and 12 as set forth above. In addition, he did not take reasonable care on his own to investigate, despite having had ample chance to do so. Therefore, CMP cannot prove its claim for negligent misrepresentation.

a.      **The fraud claim**

With respect to its fraud claim, CMP directs us to the principles we set forth in ***Anderson v. Warren***, 2001 WL 1683810 at *3 (Tenn. Ct. App.), as a statement of the Tennessee law governing suits for fraud:

In order to prevail on its claim of fraud against Eggleston, Capital Management must prove that Eggleston (i) made an intentional misrepresentation with regard to a material fact; (ii) had knowledge of the representation's falsity, in that he made the representation either knowingly or without belief in its truth or recklessly without regard to its truth or falsity; (iii) that Capital Management reasonably relied on the misrepresentation and suffered damages as a result of such reliance; and, (iv) that the misrepresentation related to an existing or past fact.

CMP insists that Eggleston's conduct rose to the level of fraud under this standard. CMP contends that because Eggleston had taken business and accounting courses in college, and had been trained to prepare financial statements in the format in which they were presented to CMP, he must have known that Eggleston Works had never made a profit in the five years it had been in existence prior to seeking loans from CMP. In light of Eggleston's business training, CMP argues, the disparity between the actual loss of Eggleston Works in 1996 (which CMP contends to have been $264,725.00), and the loss shown on Eggleston's 1996 year-end profit-and-loss statement ($23,887.00) must be considered an intentional misrepresentation, one that was material to CMP's decision to make loans to Eggleston Works and upon which CMP reasonably relied.

Furthermore, CMP contends that Eggleston's failure to inform Mike Sabre that he regularly paid his personal expenses, and expenses for which there was insufficient documentation, from the company's coffers, constitutes a withholding of information that rises to the level of fraud. CMP states: "It strains credulity to believe that Eggleston did not know the true financial condition of the Company which he had founded and over which he had complete control. The financial statements which he provided to Capital Management were false, and he must have known that fact."

We hold that the trial court did not err in concluding that Eggleston did not make fraudulent misrepresentations to CMP. The record shows that Eggleston was a fledgling entrepreneur whose education in business matters was limited to a few semesters of business and accounting courses toward the end of his abortive college career. Eggleston's primary skill and interest was in designing speakers, and by Sabre's own testimony, Eggleston Works sorely needed a seasoned business person with financial acumen to help realize what Sabre saw as the company's enormous potential. Both sides introduced testimony concerning the disparity between the actual loss sustained by Eggleston Works in 1996 versus the loss stated on Eggleston's 1996 financial statements for Eggleston Works. The overwhelming weight of the testimony supports the trial court's conclusion that Eggleston made no material misrepresentations to CMP. At the relevant time, Eggleston Works was a company experiencing tremendous growth, due to favorable publicity that resulted in increased demand for its products, and it seems clear from the evidence that Eggleston's alleged misstatement of the company's loss may have been due either to differences in accounting methods used by Eggleston and the company bookkeeper, or due to Eggleston's own naivete concerning accounting matters. With respect to CMP's claim that Eggleston diverted company funds for his own benefit, the evidence in this lengthy transcript does not support such claims. While it is true that Eggleston Works may have paid some of Eggleston's personal expenses, it appears from the evidence that this arrangement was necessitated by the fact that Eggleston had deferred his own compensation due to

the financial challenges the company faced at various times. Under these circumstances, we cannot say the trial court erred in refusing to find that Eggleston made material misrepresentations to CMP.

Also important, in our view, is the question of reliance. Sabre admitted under cross-examination that he relied upon a panoply of information *in addition to* the financial statements that Eggleston supplied, in making his decision to loan money to Eggleston Works, and Sabre admitted he had discarded some of this material upon which he relied. Furthermore, given that Sabre was vastly more experienced in business matters than Eggleston—with a lengthy resume including experience analyzing and investing in start-up businesses—it strikes us as highly implausible that Sabre relied upon Eggleston's financial statements to the extent that he claimed. We note, for example, that Sabre seemed relatively unfazed by incidents that would seem to have been stark warning signs of Eggleston Works' precarious financial condition, such as the fact that Eggleston Works' very first check for interest on a loan was returned by the bank for insufficient funds. Under these circumstances, we are skeptical about whether Sabre actually relied upon Eggleston's representations concerning the financial condition of the company, and we conclude that even if he did, the reliance would not have been reasonable. The trial court did not err in holding that Eggleston did not commit fraudulent misrepresentation.

b.      **The negligent misrepresentation claim**

CMP further contends that, if the trial court did not err in concluding that Eggleston had committed no fraud against CMP, then it certainly erred in failing to find that he had made negligent misrepresentations to it. As we stated in the case of ***Kinard v. Cook***, 1991 WL 27378 at \*3 (Tenn. Ct. App. March 6, 1991), the elements of negligent misrepresentation are set forth in § 552 of the Restatement (Second) of Torts:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others and their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to losses suffered
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it;
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

-15-

Applying the elements of negligent misrepresentation to the facts at bar, CMP argues that Eggleston committed negligent misrepresentation in the following ways:

> There can be no question that Eggleston was in the course of his business and involved in a transaction in which he had a pecuniary interest at the time he provided the financial statements to Capital Management and withheld information regarding his use of company funds for his personal benefit. Further, there can be no question that this information was provided to guide Sabre and Capital Management regarding the loans to Eggleston Works which Capital Management was contemplating, and that Capital Management suffered a pecuniary loss as a result of its reliance upon that information. Capital Management further submits that Eggleston failed to exercise reasonable care or competence in preparing the financial statements (and withholding from Capital Management the fact of the payments by the Company for his personal benefit) so as to render him liable to Capital Management for negligent misrepresentation.

We need not provide extensive analysis of this issue, because, as we stated in our discussion of CMP's fraudulent misrepresentation claim, we conclude that the trial court did not err in concluding that Sabre did not rely on Eggleston's representations, and even if he did so rely, such reliance would not have been reasonable. We think the evidence supports the trial court's conclusion. Under these circumstances, it was proper for the trial court to reject CMP's claim for negligent misrepresentation.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs in this appeal are assessed against the Appellant, Capital Management Partners, Inc. and its surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.