# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 14, 2010 Session

## SOLES4SOULS, INC. v. DONELSON CEDARSTONE ASSOCIATES, LP ET AL.

**Appeal from the Chancery Court for Davidson County**
No. 08-62-III     Ellen H. Lyle, Chancellor

**No. M2009-01906-COA-R3-CV - Filed December 17, 2010**

In a landlord-tenant dispute, the tenant plaintiff claims that before the parties entered into a lease for commercial property, the landlord defendants misrepresented estimated operating expenses that the plaintiff was expected to pay as part of its rent pursuant to the lease terms. The plaintiff appeals the trial court's dismissal of its claims for fraud and violation of the Tennessee Consumer Protection Act. We find that the defendants misrepresented estimated operating expenses after entering into the initial lease with the plaintiff but before entering into an agreement for expansion space. We therefore reverse the judgment of the trial court on the plaintiff's claims for fraud and violation of the TCPA and remand for determination of an appropriate remedy for damage the plaintiff suffered after agreeing to lease the expansion space.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Stephen C. Knight and Nader Baydoun, Nashville, Tennessee, for the appellant, Soles4Souls, Inc.

Phillip F. Cramer and Samuel P. Funk, Nashville, Tennessee, for the appellees, Donelson Cedarstone Associates, LP, Donelson Cedarstone, LLC, Smartspace, LLC, and Floyd Shechter.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a landlord-tenant dispute over a commercial lease. The plaintiff, Soles4Souls, Inc., leased 1,505 square feet of office space from the landlord defendants, which consist of Donelson Cedarstone Associates, L.P., Donelson Cedarstone, LLC, and SmartSpace, LLC, in December 2006.[1] The leased space was located in the Donelson Cedarstone Bank Building, a historic office building in the Donelson area.

Under the lease terms, Soles4Souls was required to pay a portion of the building's operating expenses, per square foot, as additional rent. The lease contained an "expense stop," which provided that Soles4Souls would not have to pay the first $4.50 per square foot of operating expenses that would otherwise be allocated to it. In other words, Soles4Souls would pay for only operating expenses that exceeded $4.50 per square foot. The parties presented differing accounts about their discussions regarding the expense stop. Soles4Souls claimed that it was "assured" that $4.50 per square foot would be more than enough to cover the operating expenses of the building. However, Floyd Shechter, the managing member of Donelson Cedarstone, LLC, testified that he told the plaintiff only that the operating expenses for the buildings in that zip code had never exceeded $4.50 per square foot in the first year of operation. Soles4Souls claims to have signed the lease in December 2006 based upon Mr. Shechter's assurances.

Soles4Souls moved into the building on February 1, 2007. On February 19, 2007, the parties entered into a letter of intent whereby the defendants agreed to build out additional space in the building for the plaintiff. The letter of intent contained the same $4.50 expense stop.

The parties' relationship began to deteriorate between April and August 2007 as the expansion space was built out at a much greater cost than anticipated. Soles4Souls moved into the expansion space on June 29, 2007, two days early. The trial court noted that the hurried completion of the expansion space to accommodate the early move-in resulted in a "protracted and contentious punch list process."

---

[1] The owner and landlord of the building is Donelson Cedarstone Associates, L.P., a limited partnership owned by a number of individual limited partners and its general partner, Donelson Cedarstone, LLC. Floyd Shechter is the managing member of Donelson Cedarstone, LLC. The other member of Donelson Cedarstone, LLC is Jay Rosenblum, who handles day-to-day property management. Mr. Shechter is also a member of SmartSpace, LLC, which manages the properties developed by Mr. Shechter.

The parties appeared to have settled their differences when, on August 20, 2007, they executed the Commencement Date Agreement, which contained an acknowledgment by the plaintiff that the landlord had performed all of its obligations under the lease and that the landlord would indemnify the plaintiff for any regulatory issues arising out of third-party claims.

Three days after the Commencement Date Agreement was signed, Soles4Souls received a bill from the defendants reflecting actual operating expenses for 2007 of $7.72 per square foot, $3.22 above the expense stop.

From August to November 2007, the plaintiff began an investigation of the building's operating expenses, seeking the defendants' tax records, budgets, and an audit of their books. On January 10, 2008, the plaintiff filed this lawsuit against Donelson Cedarstone Associates, L.P., Donelson Cedarstone, LLC, SmartSpace, LLC, and Floyd Shechter, citing causes of action for fraud and constructive fraud, fraud in the inducement,[2] negligence, and violation of the Tennessee Consumer Protection Act ("TCPA"). The defendants asserted counterclaims for breach of contract (against Soles4Souls), tortious interference with business relations (against Soles4Souls and Wayne Elsey, the CEO of Soles4Souls), and violation of the TCPA (against Soles4Souls and Elsey).

During discovery, a computer forensics expert located a document on the defendants' computer showing calculations of operating expenses of $7.04 around the time the plaintiff signed the lease that contained the $4.50 expense stop.[3] Julie Festa, the administrative assistant of SmartSpace, and Jay Rosenblum, the other member of Donelson Cedarstone, LLC along with Mr. Shechter, prepared the calculations. The defendants began invoicing Cedarstone Bank, the anchor tenant of the building, for additional rent based on operating expenses of $7.04 per square foot on January 1, 2007. Soles4Souls claimed that the defendants knew or should have known in December 2006 that operating expenses for the building would exceed $4.50 per square foot but did not provide this information as required by the agreements. The defendants blamed the discrepancy in estimated operating expenses on oversight and inexperience. Mr. Shechter testified that, at the time of his estimation, operating expenses could not have been calculated based on actual expenses because the building was only 50% occupied and had been occupied at 50% for only five months.

_____

[2] In the alternative to the fraud in the inducement claim, the plaintiff claimed breach of contract.

[3] This document was referred to as the "$7.04 budget" throughout the trial. The defendants disagree that the document was actually a formal "budget," although they titled it "Donelson Cedarstone 2007 Budget." Mr. Shechter testified that it was "a piece of paper prepared to send a statement to a tenant," and "not a budget prepared under the process." The defendants maintain that a document is not an actual budget until it is approved by Mr. Shechter, and Mr. Shechter did not access the "$7.04 budget" until June 2007.

At a May 15, 2009 hearing, the court ruled from the bench denying the plaintiff's motion for summary judgment to dismiss the defendants' counterclaim. The court took under advisement the defendants' motion for summary judgment and/or motion for judgment on the pleadings. On May 21, 2009, the court dismissed the plaintiff's claim for negligence and denied summary judgment as to the plaintiff's other claims for fraud, fraud in the inducement, and violation of the TCPA.

The case was tried over five days beginning on June 8, 2009. The court dismissed Soles4Souls's claims of fraud, negligent misrepresentation,[4] and violation of the TCPA. The court found that the defendants did not make intentional or negligent misrepresentations or mislead the plaintiff. The court believed the testimony of Mr. Shechter that he gave no assurances to the plaintiff about the adequacy of the $4.50 per square foot expense stop. Rather, the court found that the proof established that this had been Mr. Shechter's experience in the past and that the excessive expenses were aberrant and unforeseen. Furthermore, the trial court found that, in negotiating the lease and agreeing to the $4.50 expense stop, the plaintiff assumed the risk of this unforeseen circumstance.

With regard to plaintiff's alternative claim for breach of contract, the trial court concluded that the plaintiff did not make out a case for rescission. The court did, however, award specific performance with respect to the plaintiff's claims for Americans with Disabilities Act ("ADA") compliance and HVAC ventilation repairs.

The court dismissed the defendants' counterclaim with prejudice. The court found that the alleged defamatory statements about Mr. Shechter resulted in no damage to his reputation. The court dismissed the defendants' claims for breach of contract as a matter of law.

On appeal, Soles4Souls challenges the court's dismissal of its fraud and TCPA claims against Donelson Cedarstone Associates, L.P., Donelson Cedarstone, LLC, and SmartSpace, LLC. It does not challenge the trial court's dismissal of its claims against Floyd Shechter or the court's resolution of the breach of contract claims.

STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We review

---

[4] The plaintiff did not make a separate claim for negligent misrepresentation in its complaint. In its claims for fraud, constructive fraud, and fraud in the inducement, the plaintiff alleged that the defendants made negligent misrepresentations and omissions.

questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

This case involves a contract between a tenant and a landlord. The interpretation of a contract is a question of law, and therefore our review is de novo with no presumption of correctness. Tenn. R. App. P. 13(d); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). In interpreting a contract, we seek to ascertain the intent of the parties from the language of the contract; in so doing, we must apply to those words their usual, natural, and ordinary meaning. *Staubach Retail Servs.-SE, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005). The parol evidence rule generally prohibits the use of extrinsic evidence to alter or contradict the plain meaning of an unambiguous written contract. *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 558 (Tenn. Ct. App. 1991); *Stamp v. Honest Abe Log Homes, Inc.*, 804 S.W.2d 455, 457 (Tenn. Ct. App. 1990). To aid the court's discernment of the parties' intention, however, the parol evidence rule does not prohibit the court from considering the circumstances surrounding the formation of the contract, the business to which the contract relates, and the construction placed upon the contract by the parties in carrying it out. *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000); *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997); *Richland Country Club*, 832 S.W.2d at 558; *Coble Sys., Inc. v. Gifford Co.*, 627 S.W.2d 359, 362 (Tenn. Ct. App. 1981).

ANALYSIS

On appeal, the plaintiff asks the court to reverse the trial court's dismissal of its fraud and TCPA claims. More specifically, the plaintiff makes arguments for claims of fraudulent or intentional misrepresentation, fraudulent nondisclosure, and violation of the TCPA.[5]

The plaintiff claims that the defendants committed fraud and violated the TCPA in the following actions:

---

[5] This court has noted that there is not a separate cause of action for intentional misrepresentation in Tennessee. *Fairway Village Condo. Assoc., Inc. v. Conn. Mutual Life Ins. Co.*, 934 S.W.2d 342, 347 (Tenn. Ct. App. 1996). Rather, intentional misrepresentation is an element of fraud. *Id.* However, "the two are often used interchangeably in common parlance." *Id.*; *see also Parks v. Fin. Fed. Sav. Bank*, 345 F. Supp. 2d 889, 895 (W.D. Tenn. 2004) (noting that "under Tennessee law, there is not a separate cause of action for intentional misrepresentation" and that "intentional misrepresentation is an element of a cause of action for fraud rather than an independent cause of action"); *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999) (stating that the terms "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are synonymous). Because the parties and the trial court used the terms interchangeably, we will do the same for purposes of this opinion.

1. Affirmative misrepresentation of their actual estimate of 2007 operating expenses at the lease signing on December 8, 2006.
2. Fraudulent nondisclosure of the existence of the $7.04 budget on December 8, 2006.
3. Violation of the TCPA by their reassurances concerning the $4.50 expense stop and nondisclosure of the $7.04 budget on December 8, 2006.
4. Fraudulent nondisclosure of the existence of the $7.04 budget between December 8, 2006 and the signing of the expansion agreements on February 19, 2007 and May 10, 2007.
5. Violation of the TCPA by nondisclosure of the $7.04 budget between December 8, 2006 and the signing of the expansion agreements on February 19, 2007 and May 10, 2007.

The trial court found that the defendants did not make intentional or negligent misrepresentations or mislead the plaintiff.

Soles4Souls raises two issues on appeal: (1) whether the trial court erred in finding that the defendants created the $7.04 budget after they told the plaintiff that they did not expect operating expenses to exceed $4.50; and (2) whether Jay Rosenblum's knowledge of the $7.04 budget is attributable to the landlord defendants.

Soles4Souls is not challenging the trial court's dismissal of claims based on representations made before the defendants prepared the $7.04 budget. Rather, Soles4Souls bases its appeal on the defendants' estimate of the 2007 operating expenses in the $7.04 budget. Specifically, Soles4Souls contends that the defendants estimated that the operating expenses would be $7.04 per square foot and that they misrepresented and concealed that estimate. Thus, the relevant question is whether the $4.50 operating expense estimate was the defendants' actual estimate when they made representations about the adequacy of the expense stop.

A number of dates are critical to our analysis. Wayne Elsey, the founder and CEO of Soles4Souls, first visited the Donelson Cedarstone Bank Building in October 2006. From that time until December 2006, the parties had several communications about the property and the $4.50 expense stop was discussed. The parties reached an agreement and signed the lease containing the $4.50 expense stop on December 8, 2006. On January 1, 2007, SmartSpace issued Cedarstone Bank, the anchor tenant in the building, an invoice for additional rent based on operating expenses of $7.04 per square foot. Soles4Souls moved into the building on February 1, 2007. That same month, Soles4Souls expressed an interest in leasing additional space in the building, and the parties signed a letter of intent on February 19, 2007, which contained the same $4.50 expense stop. An amended lease was signed May 10, 2007, noting changes to the size and configuration of the space. Soles4Souls

moved into the expansion space on June 29, 2007. On August 23, 2007, Soles4Souls was billed for $7.72 in actual operating expenses, retroactive to February 1, 2007.

Soles4Souls takes issue with the trial court's finding that the defendants prepared the $7.04 budget "a couple" or "a few" weeks after the $4.50 estimate. Specifically, Soles4Souls insists that the $7.04 budget was prepared on December 7, 2006, while the lease was signed and final assurances regarding the $4.50 expense stop were made on December 8, 2006.

The trial court was not explicit in its findings about the timing of the preparation of the $7.04 budget relative to assurances made about the $4.50 expense stop and the signing of the lease. In its findings of fact and conclusions of law, the court stated that the plaintiff's computer forensics expert "located documents on the defendants' computer showing calculations by the defendants only a few weeks after the plaintiff signed the lease of operating expenses of $7.04 in contrast to the $4.50 expense stop discussed with the plaintiff." Based on that discovery, the court stated that "the plaintiff determined" that on December 7, 2006, Festa and Rosenblum prepared the $7.04 budget and that the "document was issued within a month of Mr. Shechter's conversations with the plaintiff, concerning the adequacy of [the] $4.50 expense stop for operating expenses." Additionally, the trial court stated that the plaintiff discovered "that within a month or so of making the alleged assurance of $4.50 per square foot, the Landlord all along had been billing another tenant for operating expenses of $7.04 per square foot." In another instance, the trial court stated that "within a couple of weeks" of the $4.50 estimate, the defendants prepared the $7.04 budget. However, the trial court acknowledged that the defendants prepared the $7.04 budget in December 2006 and began billing the bank for $7.04 at that time.

The evidence preponderates against the trial court's finding that the $7.04 budget was prepared after the parties signed the lease on December 8, 2006. The evidence instead shows that the $7.04 budget was prepared before the parties signed the lease on December 8, 2006. Mr. Rosenblum himself testified that the $7.04 budget was completed by December 7, 2006:

Q: But now you know that it [the $7.04 budget] was prepared in '06, in December of '06, when that – you know, by that meeting [between Rosenblum and Festa], which was December the 7th, and you would have approved it by December 7th?

A: That's correct. I would have had to have, obviously.

Again, if I could just add –

Q: Yes, sir.

A: – approval is kind of a loose word. It was a, do you got it done? Yeah. Okay. Let me get it out.

It wasn't like going over it with a fine tooth comb, obviously, or looking at things. I was trying to get the paper out.

Q: But you did go over it?

A: To some extent, I definitely would have seen it in front of me, yes.

Additionally, the plaintiff's computer forensics expert testified that the file in question, a spreadsheet titled "Cedarstone Proposed 2007 Budget.XLS," was created on December 3, 2006 at 6:10:35 p.m.

The defendants argue that it does not matter whether Mr. Shechter made any assurances about the $4.50 expense stop after the creation of the $7.04 budget for two reasons. First, Mr. Shechter did not know about the existence of the $7.04 budget. Second, Mr. Shechter's assurances were accurate, regardless of when they were made, because he only assured the plaintiff that in his experience in redeveloping commercial real estate in that zip code, the operating expenses history never exceeded $4.50 per foot in the first few years of operation. The trial court agreed with this position. The timing of the creation of the $7.04 budget relative to the lease signing did not matter in the trial court's analysis because it found that Mr. Shechter's representations were truthful and accurate at the time he made them.

The plaintiff takes issue with the trial court's failure to mention representations made by the defendants at the lease signing on December 8, 2006. The plaintiff insists that the trial court mistakenly concluded that the final representations about the $4.50 expense stop made by Mr. Shechter occurred on November 30, 2006, when, in fact, they occurred on December 8, 2006, after the creation of the $7.04 budget. In its order, the trial court did not specifically comment on representations made by the defendants after the creation of the $7.04 budget and before the lease was signed. However, as discussed, the trial court did not base its decision on the timing of the creation of the $7.04 budget but rather on the accuracy of the representations made by Mr. Shechter.

The parties' testimony about Mr. Shechter's representations on the day of the lease signing do not preponderate against the trial court's factual finding regarding the type of representations made by Mr. Shechter and the accuracy of those representations. Mr. Elsey of Soles4Souls testified:

Q: Did you actually talk about it [the $4.50 expense stop] around the time you signed the lease?

A: Yes.

Q: Did he [Mr. Shechter] give you the same representations?

A: Yes, he did.

Q: Tell the Court what he told you. Was it pretty much the same or –

A: It was pretty [much] the same. He said he had been developing and redeveloping in Donelson in that Zip Code for many years.

    He had several, you know – a number of projects and based on his expertise, that [$]4.50 would be more than adequate for the foreseeable future.

Mr. Goughary, the COO/CFO of Soles4Souls, also testified about Mr. Shechter's representations:

Q: Were you present when a discussion was had, that Mr. Elsey testified about, on December the 8th, the day that you signed the lease?

A: The day that we signed the lease, yes, sir.

Q: Okay. Was there a discussion done right before you signed the lease?

A: Yes. In the context of, you know, one last time, we're concerned about this open-ended clause. Are you sure this is adequate. And the answer was, yes, it's more than adequate.

When questioned about any statements he made regarding operating expenses on the day the lease was signed, Mr. Shechter testified:

[N]ot less than three nor more than four occasions when the subject of operating expense stop and what was included came up, I told them the operating expense stop was $4.50 a foot, all the expenses of the building were included in that stop; the landlord was responsible for the operating expenses up to that point and anything over that the tenant's responsible for; in our history as a company during the first years of operating redeveloped office

-9-

buildings, we'd never had an operating expense history that showed those expenses greater than [$]4.50 a foot in the first year.

Mr. Shechter further stated:

And I said to them . . . , our experience in redeveloping real estate in this zip code includes six office buildings, and in the first year of operation and in several years thereafter, the operating expense history of those buildings has never exceeded $4.50 a foot.

That's a true statement. It was a true statement the day I made it. It's still a true statement today. And I made that statement on not less than two nor more [than] three other occasions to both Mr. Elsey and Mr. Goughary.

And, Mr. Baydoun, under no circumstances in the over 300 leases I've negotiated in my life have I ever represented to a prospective customer that the rate the property was being leased at would include all the operating expenses they'd ever incur at that property for all time. That would be a ridiculously stupid statement and I'd never make it.

The trial court specifically commented on the credibility of Mr. Shechter:

First, the Court believes Mr. Shechter's version of the discussions with the plaintiff in October and November of 2006 about the expense stop. The Court credits Mr. Shechter's testimony that what he told the defendants, when they asked if the $4.50 was going to cover the operating expenses, is that he said his experience in redeveloping real estate in that zip code included six office buildings, and in the first year of operation and in several years thereafter, the operating expense history of those buildings had never exceeded $4.50 a foot. The Court dismisses the claim that Mr. Shechter assured the plaintiff that the $4.50 expense stop would cover operating expenses for the foreseeable future. The Court believes Mr. Shechter's version for several reasons.

Foremost, Mr. Shechter was forthright and believable in his testimony. Additionally, Mr. Shechter had no motivation to make a misrepresentation to the plaintiff. This was a boom real estate market, the Building was almost completely leased, and so he had no economic incentive to make a misrepresentation, especially given his reputation and experience in the industry and in that neighborhood. Also, the space in issue was a small

-10-

percentage of the defendants' portfolio. It was only 1,505 feet and then the additional 2,659 feet for the expansion space compared to 515,000 square feet of other office space of the defendants. Furthermore, Mr. Shechter testified that the $4.50 expense stop was his practice or custom. What he claims he told the plaintiff was the "script" that he has given to 40 customers for the last 5 years. The other practice or custom aspect is that every tenant in the Building had a $4.50 or $5.00 expense stop. For all of these reasons, Mr. Shechter's version about what was said about the expense stop is more credible than the plaintiff's testimony.

The trial court also discussed the defendants' explanation for how Mr. Shechter could estimate the building's operating expenses to the plaintiff as $4.50 per square foot when his assistant issued a document entitled "Donelson Cedarstone 2007 Budget" showing $7.04 in operating expenses and issued monthly invoices in that amount for additional rent to the anchor tenant beginning in January. The defendants chalked it up to inexperience. The trial court summarized the defendants' position regarding its alleged mistake in calculating the $4.50 budget:

Mr. Shechter testified that when he and the plaintiff had discussions in October and November of 2006 about the adequacy of the $4.50 per square foot expense stop, there was not enough data on the actual operating expenses of the Building to use or estimate operating expenses based on actual expenses. At that time the Building was only 50% occupied; the other portion was a shell being built out. Moreover, even the occupied spaces had only been so for five months. Also, no tenant of the Building in 2006 had been billed Additional Rental because the Building was still under construction. Due to partial and start-up occupancy, there was an insufficient track record of the Building's actual operating expenses to gauge those expenses. Operating expenses could not be calculated based on actual expenses.

Accordingly, what Mr. Shechter did in answering the plaintiff's questions in October and November of 2006 on the $4.50 amount is that he used data from the other two buildings he had developed nearby, in that same zip code. His methodology was that those buildings had been in existence and operated as office space in the zip code for over three years. They, therefore, had stabilized operating history. He took into account that operating expenses increase over time because equipment and construction wear out. He, therefore, used the operating expenses for the first several years of the 6 or so office buildings he had developed in that zip code to estimate the operating expenses of the Building. The operating expenses of the other buildings in

their first few years had not exceeded $4.50 per square foot. The proof established that the initial operating expenses at Two Rivers Corporate Centre were $3.10 per square foot for five years, and they were about $4.05 at Donelson Corporate Centre for the first years.

The court found that there was "no proof that Mr. Shechter falsely represented his own estimate at the time it was made." The court noted the following:

> It is undisputed that the other buildings partly owned by Mr. Shechter, the Donelson Corporate Centre and Two Rivers Corporate Centre, have never had operating expenses as high as the Donelson Cedarstone Bank Building. The proof established that the operating expenses for the Two Rivers Corporate Centre have never exceeded $4.50 per square foot after seven years of operation, with the operating expenses being this past year in the $3.00 range. Similarly, it was not until the end of the third year of full operation of the Donelson Corporate Centre—a larger building with additional expenses such as elevator maintenance and more common area—that its operating expenses just started to exceed $4.50. Rejecting the plaintiff's testimony that Mr. Shechter assured the plaintiff of a $4.50, in effect, ceiling on operating expenses, the Court finds that Mr. Shechter stated only an estimate and stated a truthful explanation and data to back up the estimate.

The inexperience of Ms. Festa and Mr. Rosenblum in preparing the $7.04 budget was also a contributing factor to an inaccurate calculation of operating expenses. Ms. Festa was hired in November 2006, in a newly created position. She had never worked in real estate previously and testified that her job was "unbelievably overwhelming" during her first few weeks. One of her duties for SmartSpace was to prepare operating expense budgets, which are used to calculate rent escalations that are charged to the tenants. Ms. Festa testified that she prepares the initial budget herself and then goes over it with Mr. Rosenblum. Typically, the operating expense budgets are prepared in late November or early December for the following year and are then mailed to tenants with the January invoices sometime in middle or late December.

Ms. Festa testified that because there was no prior year (2006) budget for the Cedarstone Bank Building, she started with the prior year (2006) per-square-foot costs from the Donelson Corporate Centre to calculate operating expenses. Mr. Shechter testified about why that methodology was flawed. First, there were expenses at the Donelson Corporate Centre, such as those connected to the building's elevators, which did not exist at the Donelson Cedarstone Bank Building. Second, the 2006 expenses of the Donelson Corporate

-12-

Centre were for an older building and were not comparable to the initial expenses of a newly renovated building like the Donelson Cedarstone Bank Building.[6]

The trial court also believed Mr. Shechter's testimony that Ms. Festa did not notify him of her $7.04 calculation and that he did not know that the 2007 operating expenses for the building exceeded $4.50 until June 2007.[7] The court found that Ms. Festa's projected budget for the building was "not indicative of fraud or deceit because the underlying data did not come from actual expenses of the Building nor from comparable data." Rather, the projected budget was a mistake based on past data at a different building. The court concluded that the closeness between the $7.04 operating expense budget prepared in-house and the $7.72 actual operating expenses was coincidental.

The trial court discussed "the most suspicious aspect of the alleged mistake" made in calculating the budget—Mr. Rosenblum approved the $7.04 budget that he and Ms. Festa prepared even though he was present just a few weeks earlier on November 30, 2006 when Mr. Shechter discussed with Soles4Souls the adequacy of a $4.50 expense stop. He was also present at the December 8, 2006 lease signing. Mr. Rosenblum testified that he did not realize the discrepancy because he was "scrambling" in December 2006 to issue the budgets to the various tenants of the other office buildings. Mr. Rosenblum had no previous experience in managing property. The trial court stated:

> Mr. Rosenblum testified that because of his inexperience he missed and
> erroneously approved Ms. Festa's mistake in using 2006 Donelson Corporate
> Centre expenses to extrapolate 2007 expenses for the Building. He testified
> that Ms. Festa's 2007 Budget for the Building was a mistake and not a reliable
> method. It was coincidence or bad luck that her mistake turned out to be

___

[6] The parties testified that most operating expenses at the Cedarstone Bank Building would have been lower because it had been recently rehabilitated. Additionally, Mr. Rosenblum testified about specific estimates contained in the $7.04 budget and why they were "really far off and wildly wrong." For example, he testified that estimates for cleaning, electricity, and gas services were way too low, while estimates for landscaping and exterior maintenance were way too high.

[7] Mr. Shechter testified that, in June 2007, he approached Mr. Rosenblum to receive a draw because he was getting married and needed money. Mr. Rosenblum told Mr. Shechter that he could not give him his draw because they did not have any cash, which was a result of Cedarstone Bank Building running at a deficit. Mr. Rosenblum had been paying the bills on the Cedarstone Bank Building out of SmartSpace's account. Mr. Shechter inquired as to whether Mr. Rosenblum had been "working [off] a budget" for Cedarstone, and Mr. Rosenblum replied that he had not. At that point, Mr. Shechter instructed Mr. Rosenblum to investigate "[h]ow much he spent on the Cedarstone Bank building with SmartSpace's money and to invoice all five tenants for their pro-rata share of that money." Mr. Shechter estimated that it then took Ms. Festa "a couple of weeks to input five months of expenses through the end of May."

-13-

closer to the actual operating expenses than the $4.50 estimated by Mr. Shechter.

The court found that the "the time the defendants knew or should have known that operating expenses would exceed $4.50 was June 2007 when there was enough data and Mr. Shechter instructed Mr. Rosenblum to track the actual expenses of the Building." The timing is significant because it means Soles4Souls committed to both leases, for the initial space as well as the expansion space, before the defendants knew or should have known about the higher operating expenses. As a result, the court concluded that the defendants' mistake in calculation did not affect the plaintiff's actions.[8]

This court gives great weight to a trial court's findings that rest on determinations of credibility. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). The trial court thoroughly and convincingly explained its reliance on Mr. Shechter's testimony over that of Mr. Elsey and Mr. Goughary about the kinds of representations he made. While the trial court did not make factual findings regarding Mr. Shechter's credibility about representations he made the day of the lease signing, none of the parties claims that Mr. Shechter made any unique representations on that occasion that he had not previously made. The evidence does not preponderate against the trial court's assessment of the types of assurances that were made prior to the parties' signing the lease. Although the $7.04 budget was prepared before the parties signed the lease, there is no proof that Mr. Shechter made false representations about the $4.50 expense stop at the lease signing. His assertions about the adequacy of the $4.50

---

[8] The court noted, however, that the one legal obligation that Soles4Souls entered into subsequent to the defendants' realization in June 2007 of the greater operating expenses was the August 20, 2007 Commencement Date Agreement for the expansion space. The agreement was a result of the contentious punch list process that unfolded after Soles4Souls moved into the expansion space on June 29, 2007. The agreement contained an acknowledgment by Soles4Souls that the landlord had performed all of its obligations under the lease and that the landlord would indemnify Soles4Souls for any regulatory issues arising out of third-party claims. The defendants did not provide notice to Soles4Souls of the higher operating expenses at that time because of the advice of counsel during the punch list dispute.

The trial court found that, although there was no requirement under the lease to provide updated operating expense information to Soles4Souls, the defendants provided notice to all other tenants in the building in June 2007 of the increase in operating expenses. Thus, the court concluded, the defendants voluntarily assumed and took on a duty to notify tenants of the operating expenses in June 2007. Further, the plaintiff testified that had it known of the increase in operating expenses in June 2007, it would not have signed the Commencement Date Agreement. As a result, the court did not enforce the Commencement Date Agreement, and the plaintiff's breach of contract claims related to the build out of the expansion space were not barred. Pursuant to those claims, the court required the defendants to perform specific repairs to comply with the ADA and to install a heating and air conditioning vent. The court also awarded Soles4Souls $1,322.00 in damages for overcharges by the defendants.

-14-

expense stop for other buildings in the zip code were truthful and supported by historical data.

We must apply these facts to the elements of the plaintiff's claims for fraudulent or intentional misrepresentation, fraudulent nondisclosure, and violation of the TCPA.

Fraudulent or Intentional Misrepresentation

The defendants rely on the definition of fraud set forth in *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 40 (Tenn. Ct. App. 2006), which requires an intentional misrepresentation. The plaintiff correctly points out that fraud may also exist when a false representation was made knowingly or recklessly. *See, e.g.*, *Stanfill v. Mountain*, 301 S.W.3d 179, 188 (Tenn. 2009); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008); *Metro. Gov't of Nashville & Davidson County v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992). In order to establish a claim for fraudulent or intentional misrepresentation, a plaintiff must show the following:

> 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented fact; and 6) plaintiff suffered damage as a result of the misrepresentation.

*Walker*, 249 S.W.3d at 311. The party alleging fraud bears the burden of proving each element. *Hiller v. Hailey*, 915 S.W.2d 800, 803 (Tenn. Ct. App. 1995) (quoting *Williams v. Spinks*, 7 Tenn. App. 488 (1928)).

In order to establish a claim for fraudulent or intentional misrepresentation, Soles4Souls must first show that an existing or past fact was misrepresented. The representation in this case is the adequacy of the $4.50 expense stop. As discussed, the trial court credited Mr. Shechter's testimony over that of Mr. Elsey and Mr. Goughary. The evidence does not preponderate against the trial court's assessment of the types of assurances that Mr. Shechter made to the plaintiff. He did not misrepresent the historical adequacy of the $4.50 expense stop for other buildings in the same zip code prior to the December 8, 2006 lease signing. As a result, we conclude that Mr. Shechter did not make a false representation of an existing or past fact that the plaintiff relied on in signing the initial lease.

The court found that the "the time the defendants knew or should have known that operating expenses would exceed $4.50 was June 2007 when there was enough data and Mr.

-15-

Shechter instructed Mr. Rosenblum to track the actual expenses of the Building." We believe the defendants should have known sooner than June 2007 that its representations about the $4.50 expense stop might be inaccurate. Mr. Shechter represented that "for the first year of operation, and for the next two years after that, the expenses at our other properties had not exceeded 4.50 a foot." That was no longer an accurate statement once the defendants began billing the bank at $7.04. Soles4Souls entered into the letter of intent for the expansion space on February 19, 2007, after the defendants began billing the bank at $7.04. The letter of intent contained the same $4.50 expense stop. Mr. Rosenblum was aware of the representations that had been made regarding the adequacy of the $4.50 expense stop, and he was also aware of the existence of the $7.04 budget created for Cedarstone Bank.[9] We conclude that the defendants' actions in failing to notify Soles4Souls of the increased projection in operating expenses amounted to a false representation of a material fact upon which Soles4Souls reasonably relied in entering into the letter of intent for the expansion space.

The defendants claim that the representation was not made intentionally. As discussed, fraud may also exist when a false representation was made knowingly or recklessly. We believe the defendants' willful ignorance of the increase in operating expenses rises to that level. The trial court noted the busy and stressful conditions surrounding the preparation of the $7.04 budget in December 2006. Mr. Rosenblum characterized the time period from October to December 2006 as "wild and woolly"; he was focused on learning a line of business that was new to him, training Ms. Festa, purchasing new software, transitioning the books from one management company to another, and issuing budgets to tenants in other buildings. There is no evidence that Mr. Rosenblum heard any discussion about the expense stop at the December 2006 lease signing that would trigger a duty to mention the $7.04 budget. But those factors were no longer an issue in January and February 2007, and the defendants should have spoken up about the discrepancy between the $7.04 budget and their representations concerning the $4.50 expense stop. It is no excuse that the $7.04 budget was based on flawed methodology and ultimately inaccurate; it was the estimate that the defendants had at the time and should have been shared with Soles4Souls.

### Fraudulent Nondisclosure

Concealment or nondisclosure of a material fact may also constitute fraud:

---

[9] Mr. Rosenblum testified that he was present at least once when Mr. Shechter discussed the adequacy of the $4.50 expense stop. He also testified that he "approved" the $7.04 budget, which he stated meant that he had seen the document.

A party commits fraudulent concealment for failing to disclose a known fact or condition where he had a duty to disclose and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury. For the nondisclosure to constitute fraud, the charged party must have knowledge of an existing fact or condition and a duty to disclose that fact or condition. The fact or condition must be a material fact affecting the essence of the subject matter of the contract.

*Odom v. Oliver*, 310 S.W.3d 344, 349 (Tenn. Ct. App. 2009) (citations omitted). The material fact that the plaintiff alleges the defendants failed to disclose is the existence of the $7.04 budget.

"[L]iability for non-disclosure can arise only in cases where the person sought to be held responsible had a duty to disclose the facts at issue." *Justice v. Anderson County*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997). "Although contracting parties have a duty to disclose material facts affecting the essence of a contract's subject matter, a party does not have a duty to disclose a material fact where ordinary diligence would have revealed the undisclosed fact." *Odom*, 310 S.W.3d at 349-50. Thus, "[a] party cannot be permitted to claim that he has been taken advantage of if he had the means of acquiring the needed information or if, because of his business experience or his prior dealings with the other party, he should have acquired further information before he acted." *Id.* at 350 (quoting *Macon County Livestock Mkt., Inc. v. Ky. State Bank, Inc.*, 724 S.W.2d 343, 351 (Tenn. Ct. App. 1986)).

The trial court found that the defendants had a duty to disclose the information, but only after June 2007 when they discovered that actual operating expenses were $7.72. The trial court found that the defendants voluntarily assumed a duty to notify the other tenants of the higher operating expenses at that time. We find that the defendants had a duty to disclose the existence of the $7.04 budget when they started billing the bank at $7.04. The defendants knew that Soles4Souls was relying on their assurances about the historical adequacy of the $4.50 expense stop. At a minimum, the defendants had an obligation to investigate the $7.04 calculation and provide Soles4Souls with whatever information it had at the time that was contrary to their representations about the historical adequacy of the $4.50 expense stop.

The defendants insist that Soles4Souls was not diligent in seeking its own information and instead relied only on Mr. Shechter's representations. Both Mr. Elsey and Mr. Goughary testified that they never asked to see an operating expense history of the building or other buildings in the area. However, no operating expense history for the Cedarstone Bank Building would have existed at the time, and operating expense histories for other buildings would have revealed that Mr. Shechter's representations had previously been accurate. The

undisclosed fact in this case was the existence of the $7.04 budget, which ordinary diligence would not have revealed. *See Odom*, 310 S.W.3d at 349-50.

Tennessee Consumer Protection Act

Finally, the plaintiff insists that the defendants violated § 47-18-104(a) and (b)(27) of the TCPA. Section 47-18-104(a) states that "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices and are Class B misdemeanors." Section 47-18-104(b)(27) states that "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person" is a violation of the TCPA.

Courts must liberally construe the TCPA to protect consumers. *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 47-18-115. "The scope of the TCPA is much broader than that of common-law fraud." *Tucker*, 180 S.W.3d at 115. It applies to any act or practice that is unfair or deceptive to consumers, not just misrepresentations that are fraudulent or willful. *Id.*

> In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated . . . ." Tenn. Code Ann. § 47-18-109(a)(1).

*Id.* Whether a particular representation qualifies as "unfair" or "deceptive" is a question of fact. *Id.* at 116. In interpreting Tenn. Code Ann. § 47-18-104(a), this court is guided by the definition of "unfair" adopted by Congress in the 1994 legislation reauthorizing the Federal Trade Commission: an act or practice should not be deemed unfair "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* at 116-17 (quoting 15 U.S.C. § 45(n)). "A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Id.* at 116.

We find that Soles4Souls established that the defendants engaged in an unfair or deceptive act under the TCPA. As discussed, the defendants' representations about the adequacy of the $4.50 expense stop were false at the time the defendants began billing the bank at $7.04 and the plaintiff was misled about that fact.

-18-

CONCLUSION

The defendants made a misrepresentation of a material fact upon which the plaintiff relied in agreeing to lease the expansion space. We reverse the trial court's dismissal of the plaintiff's claims for fraud and violation of the TCPA resulting from the February 19, 2007 letter of intent for the expansion space. We remand to the trial court for determination of an appropriate remedy for damage the plaintiff suffered as a result of agreeing to lease the expansion space. Costs of appeal are assessed against the appellees.

_____
ANDY D. BENNETT, JUDGE